2019 IL App (1st) 161573

No. 1-16-1573

Opinion filed April 30, 2019

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 21025 |
| | ) | |
| OMEGA MOON, | ) | Honorable |
| | ) | Maura Slattery Boyle, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1   After a bench trial, the judge convicted Omega Moon of aggravated battery and sentenced her to 18 months' probation. On appeal, Moon argues that the trial court (i) improperly considered a fact not in evidence, (ii) failed to accurately recall evidence, (iii) assumed the role of prosecutor by *sua sponte* objecting to testimony, and (iv) allowed the State to elicit repetitive answers from Moon on cross-examination. While Moon acknowledges that she failed to raise these issues both at trial and in a written posttrial motion, she asserts that we can consider them under the plain error doctrine. We find that none of the alleged errors amount to reversible error and affirm.

¶ 2                                    Background

¶ 3      Moon was charged by information with three counts of aggravated battery causing great bodily harm or permanent disability or disfigurement (720 ILCS 5/12-3.05(a)(1) (West 2014)) and one count of aggravated battery on a public way (720 ILCS 5/12-3.05(c) (West 2014)). Before trial, the State nol-prossed the count alleging permanent disability. Moon asserted the affirmative defense of self-defense.

¶ 4      At trial, Michelle Johnson testified that on November 12, 2014, at about 6 p.m., she went with her friend Tara Sahara to pick up Sahara's children's report cards from Barton School, 7600 South Wolcott Avenue, Chicago. Sahara parked and entered the school, while Johnson remained in the car. Moon, who is Sahara's sister-in-law, drove by Johnson and asked where Sahara was. Johnson told Moon that Sahara went into the school, and Moon drove away. Johnson noticed a male passenger in Moon's car.

¶ 5      When Sahara returned to the car, Moon jogged toward her and chased her around the car. Johnson got out, told Sahara to stop, and tried "to talk some sense into" Moon. Then Moon took Johnson's purse from the car; Johnson grabbed the purse's handle with one hand. Moon hit Johnson's right eye with her closed fist three or four times with "[a] lot of force" until Johnson felt blood on her cheek. Johnson did not see a weapon in Moon's hand when Moon hit her. Moon drove away, and Johnson called the police. After attempting to follow Moon, Johnson and Sahara encountered police officers, and Johnson was taken to a hospital. Johnson agreed with the prosecutor that Moon struck her "[i]n the middle" of Wolcott Avenue, "right in front *** or right in the area of" Barton.

¶ 6      The State entered into evidence a photograph of Johnson's right eye that was taken on the way to the hospital. According to Johnson, her right upper eyelid was "split open all the way to

the eyeball." Due to the severity of the cut, Johnson had to see a plastic surgeon at a second hospital. Johnson stated that she also had cuts on the side of her nose and under her eyelid, and that she developed scars in the same areas. She acknowledged that, in 2012, she was convicted of identity theft and unlawful possession of credit or debit cards.

¶ 7     On cross-examination, Johnson testified that report card pickup ended at 6 p.m. There were no other people on South Wolcott Avenue picking up report cards, and Sahara was the only person leaving the school. When Moon approached Sahara, the man Johnson saw in Moon's car stood "on the corner" of Wolcott. The following colloquy then occurred:

> "Q. So during these two minutes that they were running around the car, Tara could have gotten in the car, right?
>
> THE COURT: Sustained, speculative."

Johnson added that, after Moon struck her, she hit Moon in self-defense and was grabbed by the man who was with Moon.

¶ 8     Sahara testified that Moon's brother was the father of her child. She agreed that, on the date of the altercation, her relationship with Moon was "not good" due to a dispute over custody. At around 5:30 p.m., she picked up her children's report cards from Barton while Johnson remained in the car. When Sahara left the school, she saw Moon running up to her "three cars away from [Sahara's] vehicle" with a sharp, silver object in her fist and her boyfriend trailing behind her. Sahara ran around her car, and Johnson left the car to "defuse the situation." Moon took Johnson's purse from Sahara's car and walked away. Johnson grabbed the purse, and Moon hit her in the forehead near the eye with her fist, causing Johnson to bleed. Moon drove away, and Sahara and Johnson drove after her and called the police. Then, an ambulance took Johnson to the hospital.

¶ 9    On cross-examination, Sahara testified that Moon had guardianship of the child for 7½ years, which ended around the date of the altercation. She parked her car "[a]cross the street from the school" and saw teachers and other parents picking up report cards inside the building, but no one else left the building while Moon and her boyfriend chased her around the car. Sahara confirmed that Moon ran at her "with something sharp in her hand," which she thought was a weapon. She acknowledged that her car was unlocked when Moon chased her around it about 10 times, but she did not try to get into the car.

¶ 10    The State entered a stipulation between the parties that, if called, Dr. Kimberly Clawson, a doctor at Mount Sinai Hospital, would testify that Johnson was treated for periorbital swelling and multiple lacerations in the area of her right eye. The State rested, and the court denied Moon's motion for directed finding.

¶ 11    The defense called Jalen Carter, who testified that on November 12, he and Moon, his girlfriend, drove to the house of Moon's cousin, Kisha Gladney, on 75th Street and Wolcott. When they got out and approached Gladney's house, a car pulled up, and Sahara and another woman jumped out, calling Moon derogatory names from 10 feet away. The other woman removed her shoes and "took the first swing" at Moon, who "defended" herself. Sahara attempted to join in, and Carter tried to separate the women. He stated that the confrontation occurred "right in front" of Gladney's house, and denied that Moon had a weapon. Carter and Moon then went to the police station, where Moon reported that two women attacked her. Afterwards, they picked up Moon's son from Saint Sabina Academy. On cross-examination, Carter testified that he did not see any blood drawn and that no one at the police station asked him what he observed. On November 19, 2014, he met with Detective Jesus Gonzalez and

denied being present at the altercation. Carter acknowledged that he was convicted of aggravated unlawful use of a weapon in 2012.

¶ 12 Lakisha Gladney, Moon's cousin, testified that Moon was supposed to pick her up around 6 p.m. to go to karaoke (Lakisha Gladney and Kisha Gladney are the same person.) Ten minutes before 6 p.m., Gladney received two calls from Moon and then heard a "commotion" outside her house. She opened her door and heard Moon sounding upset, but could not see what was happening. Barton is located near her house, and she knew it was report card day because she sat on the school council. Her neighbor was the only other person outside her house. On cross-examination, Gladney stated that her vision is impaired, and she could not see what happened when Moon was outside her house.

¶ 13 Moon testified that she drove with her boyfriend, Carter, to pick up Gladney at her home, which was "down the street" from Barton. Moon thought she was being followed. When she got out of the car at Gladney's house and saw Sahara and Johnson walking toward her, Sahara called Moon names and told Johnson to hit Moon. Johnson removed her boots and hit Moon's left cheek with her right hand. As Moon struck back in defense, Sahara approached her from behind, and with Johnson, pulled Moon's hair, scratched her, and hit her with their fists. Carter pulled Moon away, and she ran to Gladney's house and spoke with Gladney. Then, she drove to the police station and filed a report. Moon testified that she suffered "[a] great deal of loss of hair in several spots in [her] head," as well as "scratches and bruises" on her face, thighs, and hands. Moon was shown six photographs taken when she got out of jail one week after the altercation and stated they depicted bald spots on her scalp, a bruise on her face, and scratches and bruises on her leg.

¶ 14    On cross-examination, Moon denied that Johnson's eye was split open after the altercation. At the police station, she told a police officer named Barnes that she was picking up her son from Saint Sabina, that she was also picking up her cousin, and that two women attacked her. She denied telling Barnes that she was attacked at Saint Sabina.

¶ 15    The State then showed Moon each photograph depicting her injuries and asked whether she showed each injury to Barnes. During this line of questioning, this colloquy occurred:

"Q. I am showing you first what your attorney marked Defendant's Exhibit No. 1. This is a photo you took, right?

A. Yes.

Q. This shows injury to your scalp, correct?

A. Yes.

* * *

Q. You didn't show Officer Barnes that, did you?

A. Yes, I did.

Q. You did show Officer Barnes that?

A. I didn't have these pictures but I was standing there, she could see.

Q. So you showed Officer Barnes—

A. No, I didn't say look at these—

THE COURT: Ma'am, woe, woe, we're right here. Answer the questions, just answer the questions asked you. Ms. McMahon, ask the question again.

BY MS. McMAHON [(ASSISTANT STATE'S ATTORNEY)]:

Q. Did you show Officer Barnes that injury?

A. No, I showed her my hands and my bruises.

¶ 16    Later, this exchange took place:

Q. Here's Defense Exhibit No. 2. Here's another area where you claim that your hair was ripped out?

A. Yes.

* * *

Q. You didn't show that to Officer Barnes?

A. I showed her my bruises.

THE COURT: No, ma'am, that's not the question. The question is did you show her where the bald spots w[ere], whatever is indicated in No. 2, *** at the scene or at the police station, did you show that to her?

THE WITNESS: No.

* * *

Q. This photo [marked as People's Exhibit No. 2] shows really a huge bald spot covering a large portion of your scalp, right?

A. Yes.

Q. This hair was missing when you claim you went to go talk to Officer Barnes about what had happened, correct?

A. Correct.

Q. You did not show this to Officer Barnes—

A. I thought she could see it—

THE COURT: Ma'am, ma'am, you've got to calm—first sit up, sit up, you've got to sit up. Okay. Just answer the question that's asked. Mr. Gottreich—

BY THE WITNESS:

A. No.

¶ 17     During this line of questioning, defense counsel twice objected to the State's questions as "asked and answered," and the trial court overruled the objections. Ultimately, Moon testified that she showed Barnes "my arms and my hands, the scars that was on my face, [and] everything that was visible" and that she thought Barnes could see the bald spots on her scalp. Moon denied telling Detective Gonzalez that she was picking up her son from Saint Sabina with Gladney when Sahara and Johnson attacked her. She also confirmed that on November 19, 2014, Detective Gonzalez approached her while she was sitting in a van at Saint Sabina, and she showed him her scalp injuries and bruises. She denied showing Gonzalez the area outside Saint Sabina where she was attacked. The defense rested.

¶ 18     In rebuttal, the State called Chicago police officer Sharon Barnes. On the evening of November 12, Moon and a man approached Barnes at the police station. Moon told her she was the victim of a battery at Saint Sabina, where she was picking up her child. Although she said she was injured, Moon did not mention missing hair, or scratches or bruises on her face, thighs, and hands. She only reported that she was struck with open and closed hands, a purse, and keys, and that she had scratches on her hands. Moon told Barnes she did not need medical treatment; Barnes did not see missing hair or bruises or scratches on her face, arms, and hands.

¶ 19     Detective Gonzalez testified that on November 18, he and Sergeant Emmitt McClendon went to Moon's residence to speak with her about an aggravated battery that occurred in the area of 7600 South Wolcott. Moon told Gonzalez that she had gone with Gladney to pick up her son from Saint Sabina. Moon then reported that she parked her car at 78th Street and Racine Avenue when Sahara and another woman "approached her, punched her, kicked her and scratched her before they left." Moon never told Gonzalez that her hair was ripped from her scalp or that the

altercation occurred outside Gladney's house, although she claimed that Gladney was present the entire time. The next day, Gonzalez saw Moon in a van near Saint Sabina, and Moon pointed out where she claimed the battery occurred, at "approximately 1222 West 78th Street." Gonzalez testified that this area was visible in a surveillance recording that he had reviewed, which was taken the evening of November 12, between 5:45 p.m. and 8:30 p.m. In the video, he did not see Moon, Johnson, Sahara, or a physical altercation. Gonzalez also did not see injuries on Moon's person on November 18 or 19. On cross-examination, Gonzalez said the report filed by Moon stated that the altercation happened at Barton, but on re-direct examination, he clarified that Moon reported that the altercation occurred at Saint Sabina, and Johnson's report gave an address near Barton School. The State rested.

¶ 20    In closing arguments, defense counsel asserted that a reasonable doubt existed because of the conflicting testimony, the felony convictions of witnesses for both parties, and the lack of credibility of Johnson and Sahara. Defense counsel further argued that Johnson and Sahara were picking up report cards "at a time of day where presumably there would be other people picking up report cards." He claimed that Moon and Carter were going to Gladney's house, "who lives right across from" Barton, when Sahara and Johnson approached and the altercation ensued. The State argued that the testimony had credibly shown that Moon waited for Sahara to leave the school, pursued her "with a shiny object in her hand," and sliced Johnson's eye open. The State also asserted that Moon lied when she told Barnes and Gonzalez that the altercation occurred at Saint Sabina. Additionally, the State noted that neither Barnes nor Gonzalez saw the injuries that Moon claimed to have reported to them.

¶ 21    The trial court found Moon guilty of the three remaining counts of aggravated battery. The court noted there was "some discrepancy" as to where the altercation happened, since Moon

originally told police that it occurred at Saint Sabina but other testimony suggested Barton. According to the trial court, "[a]t one point then, *** Miss Moon hit [Johnson] several times *** I believe with a key resulting in a laceration in the eyelid area." The trial court noted that although Moon claimed to have suffered several injuries, "[t]here was *** no documentation or the police were never shown ripped hair, which would be profound and would be easy to view by the police officers as well as marks."

¶ 22    Additionally, the trial court stated:

> "I know there has been some discussion about weren't there a lot of people around, it was a Chicago public school day to pick up report cards, and weren't there a lot of people around. And *** the defense said, no, and the witnesses for the state said, yes. Well, the sad state of affairs is most parents don't pick up report cards. I wish I could say that was different."

The trial court stated that it found the conduct of the witnesses troubling, but concluded that Moon was not acting in self-defense and that "[n]o matter how mad you get, you have no right to hit another person with keys."

¶ 23    Moon filed a motion for new trial, arguing that due to the conflicting testimony and credibility issues on both sides, reasonable doubt existed. The trial court denied Moon's motion and sentenced her to 18 months' probation.

¶ 24                                   Analysis

¶ 25                             Fact Not in Evidence

¶ 26    Moon first argues that the trial court improperly relied on a fact not in evidence when it said "most parents don't pick up report cards." According to Moon, the trial court used this observation to bolster Sahara and Johnson's testimony that the altercation occurred at Barton, to

discredit the defense witnesses' testimony that it occurred outside Gladney's house. The State responds that this statement did not affect the outcome because (i) neither the witnesses for the State nor the defense precisely established where the altercation occurred, (ii) Moon did not raise those discrepancies as part of her theory of the case, and (iii) to the extent the trial court acknowledged conflicting testimony, the statement indicates that Johnson and Sahara testified that the altercation occurred at Barton, while Detective Gonzalez testified that Moon told him it occurred at Saint Sabina.

¶ 27    Moon acknowledges that she forfeited this issue by having failed to raise it both at trial and in a written posttrial motion. She asserts, nevertheless, that we can consider it under the plain error doctrine. *People v. Naylor*, 229 Ill. 2d 584, 592-93 (2008). The plain error doctrine will apply where a clear or obvious error occurred and one of two circumstances exist: (i) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (ii) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48. Before considering the plain error doctrine, we must first determine whether an error occurred. *People v. Sims*, 192 Ill. 2d 592, 621 (2000).

¶ 28    During a bench trial, a trial judge's deliberations are "limited to the record made before him or her during the course of the trial." *People v. Dunn*, 326 Ill. App. 3d 281, 286 (2001). "A judge's determination, based upon a private investigation or private knowledge of the court, untested by cross-examination or any of the rules of evidence, constitutes a denial of due process." *Id.* In a bench trial, we presume the trial court "considered only competent evidence in

reaching its verdict, unless that presumption is rebutted by affirmative evidence in the record." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91.

¶ 29   Moon was convicted of aggravated battery under sections 12-3.05(a)(1) and 12-3.05(c) of the Criminal Code of 2012 (Code) (720 ILCS 5/12-3.05(a)(1), (c) (West 2014)). Section 12-3(a) of the Code (720 ILCS 5/12-3(a) (West 2014)) provides that "[a] person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." Under section 12-3.05(a)(1) of the Code (720 ILCS 5/12-3.05(a)(1) (West 2014)), "[a] person commits aggravated battery when, in committing a battery, *** he or she knowingly *** [c]auses great bodily harm or permanent disability or disfigurement." Section 12-3.05(c) of the Code (720 ILCS 5/12-3.05(c) (West 2014)) provides that "[a] person commits aggravated battery when, in committing a battery, *** he or she is or the person battered is on or about a public way."

¶ 30   While Moon argues that the issue of the presence of other people at Barton picking up report cards affected the court's factual determination of where the altercation took place, the evidence at trial showed little discrepancy in terms of the altercation's location. Johnson testified that she and Sahara parked on the corner of Wolcott and 76th Street, "on an angle from the school"; Sahara testified that she parked "[a]cross the street from the school." Similarly, Moon testified that she parked at Gladney's house on the corner of 75th and Wolcott, which was "down the street" from Barton, and the altercation took place in front of Gladney's house. During closing arguments, defense counsel even described Gladney's house as "right across from" Barton. Thus, the only evidence that the altercation occurred somewhere other than the vicinity of Barton came from Moon's statements to Barnes and Gonzalez that she was attacked at Saint Sabina, and those statements, as noted, were contradicted by Moon's trial testimony. Given this

testimony and defense counsel's closing argument, the record does not show that there was a factual dispute about where the altercation took place or that Moon developed her theory of the case around that issue. See *People v. Hunt*, 234 Ill. 2d 49, 56 (2009) ("the theory under which a case is tried in the trial court cannot be changed on review" (internal quotation marks omitted)).

¶ 31    Also, during closing arguments, defense counsel asserted that Johnson and Sahara picked up report cards "at a time of day where presumably there would be other people picking up report cards." Viewing the record as a whole, the trial court may have been simply responding to this statement, explaining why defense counsel's presumption is not necessarily true. But, to the extent that the trial court's statement reflected information not in evidence, the record does not show that the observation regarding report card pickups factored into the outcome. At trial, Johnson and Sahara testified that Johnson waited in Sahara's car while Sahara went into the school to pick up her children's report cards. As Sahara left the school, Moon approached her, chased her around Sahara's car, and then took Johnson's purse out of the car. Johnson grabbed her purse by the handle and was struck by Moon near her eye, causing her to bleed. The State presented evidence of the injuries Johnson suffered, as reflected in photographs taken while Johnson was on her way to the hospital, as well as in the stipulated testimony of a doctor who saw Johnson's injuries. The strength of this evidence did not depend on the trial court's tangential statement.

¶ 32    Moreover, the State elicited testimony challenging the credibility of Moon's witnesses. Carter testified that he told Detective Gonzalez that he was not present when the battery occurred, despite the consensus between both parties' witnesses that he was there. Although Moon's witnesses testified that the altercation took place in front of Gladney's house near Barton, Gonzalez's rebuttal testimony showed that Moon initially reported a battery occurring at

Saint Sabina. Additionally, Moon testified that during her struggle, her hair was torn out in multiple places, and she suffered several scratches and bruises. Yet, Barnes and Gonzalez both testified that Moon did not show them the injuries she claimed to have suffered, and they did not see injuries on Moon. While Moon presented photographs of her alleged injuries, these photographs were taken after she was out of jail, one week after the altercation. In its ruling, the trial court noted the inconsistencies in Moon's original police report, as well as Moon's failure to show Barnes that her hair was ripped out. "[I]n a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). Having heard the State's corroborated evidence, and the evidence challenging Moon's credibility, the trial court concluded that Moon was not acting in self-defense, and convicted her of aggravated battery.

¶ 33    We must presume that the trial court considered only competent evidence unless affirmative evidence in the record demonstrates otherwise. *Simon*, 2011 IL App (1st) 091197, ¶ 91. Because the record as a whole does not affirmatively show that the trial court relied on its statement regarding report card pickups in making its determinations of credibility or guilt, the court's comment did not constitute a violation of Moon's due process rights. *People v. Jenk*, 2016 IL App (1st) 143177, ¶ 55 (affirming defendant's conviction where trial court's "benign comment" regarding fact not in evidence "did not form the basis of the court's finding" of witness credibility or guilt); *People v. Barnes*, 48 Ill. App. 3d 226, 230-31 (1977) (affirming defendant's conviction where record did not show trial court based its determination on fact not in evidence). Accordingly, we find that the trial court did not commit error in basing its

determination on facts outside of evidence and we need not consider Moon's argument under plain error review. *Sims*, 192 Ill. 2d at 621.

¶ 34                    Inference That Defendant Struck Complainant With Key

¶ 35    Moon also argues that the trial court inaccurately recalled that she struck Johnson with a key. In response, the State asserts that the evidence presented at trial supported a reasonable inference that Moon was holding a key when she struck Johnson. Moon also acknowledges she did not preserve this issue on appeal but asserts that we may review it under the plain error doctrine. Thus, we must first determine whether an error occurred. *Naylor*, 229 Ill. 2d at 593.

¶ 36    "The trial court's failure to recall and consider testimony crucial to defendant's defense" will result "in a denial of defendant's due process rights." *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992); see also *People v. Bowie*, 36 Ill. App. 3d 177, 180 (1976). So in reviewing a conviction following a bench trial, we must presume the trial court "considered only competent evidence in reaching its verdict," unless shown otherwise "by affirmative evidence in the record." *Simon*, 2011 IL App (1st) 091197, ¶ 91. "Where the record affirmatively shows that the trial court failed to recall crucial defense evidence when entering judgment, the defendant did not receive a fair trial." *People v. Williams*, 2013 IL App (1st) 111116, ¶ 75. In a bench trial, it is the trial court's responsibility "to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *People v. Kiertowicz*, 2013 IL App (1st) 123271, ¶ 19. The State has the benefit of all reasonable inferences. *Id.* Whether a defendant's due process rights have been denied constitutes an issue of law, which we review *de novo*. *Williams*, 2013 IL App (1st) 111116, ¶ 75.

¶ 37    We find the trial court's statement that Moon struck Johnson with a key was not a misstatement of fact but, rather, a reasonable inference supported by the evidence. The evidence

at trial showed that while sitting in Sahara's car, Johnson saw Moon drive by her before approaching Sahara on foot, and Sahara saw Moon holding a sharp, silver object in her hand. When Moon hit Johnson, Johnson's "eyelid was split open all the way to the eyeball." During closing arguments, the State recalled Sahara's testimony that Moon chased Sahara "with a shiny object in her hand." Based on the evidence and arguments, the trial court could have reasonably inferred that Moon, having gotten out of her car, took her car key with her and hit Moon with the key still in her hand, cutting Johnson's eyelid. See *Kiertowicz*, 2013 IL App (1st) 123271, ¶ 19. Accordingly, the trial court did not err by stating its belief that Moon struck Johnson with a key, and plain error review of this issue is unmerited. *Sims*, 192 Ill. 2d at 621.

¶ 38          Trial Court's S*ua Sponte* Objection During Defense Counsel's Cross-examination

¶ 39     Moon next argues that the trial court improperly assumed a prosecutorial role by *sua sponte* objecting to a question in defense counsel's cross-examination of Johnson. As a result of this objection, Moon claims that critical evidence was not admitted, and so this case should be remanded for a new trial. Even if the trial court did not assume a prosecutorial role, Moon asserts that we still should remand because the trial judge "created the appearance that she was assisting the prosecution." Moon also did not preserve this issue for appeal, but again, seeks review under the plain error doctrine. Again, we must first determine whether the trial court actually committed an error. *Naylor*, 229 Ill. 2d at 593.

¶ 40     "A trial court abuses its discretion when it adopts the role of advocate for one of the parties." *People v. Jackson*, 409 Ill. App. 3d 631, 647 (2011). Nonetheless, "a judge is not a mere referee, and she has wide discretion to control the course of the trial." *People v. Jackson*, 250 Ill. App. 3d 192, 204 (1993). The trial court generally "has discretion to raise objections and to question witnesses" (*People v. Wiggins*, 2015 IL App (1st) 133033, ¶ 46), and it "is permitted to

make rulings without objections from counsel" (*People v. Thigpen*, 306 Ill. App. 3d 29, 40 (1999)). Even where a court's conduct is improper, "reversal [is] warranted only if the court's conduct played a material role in defendant's conviction or prejudiced him." *Jackson*, 250 Ill. App. 3d at 204.

¶ 41    We find that in making a *sua sponte* objection, the trial court did not assume a prosecutorial role or create the appearance of supporting the prosecution. Defense counsel sought to elicit testimony from Johnson as to whether Sahara could have entered her car while she was being chased, a matter of which Johnson would not have had personal knowledge. The trial court had discretion to control the course of trial and was permitted to bar inadmissible testimony. *Id.*; *Thigpen*, 306 Ill. App. 3d at 40; see also Ill. R. Evid. 602 (eff. Jan. 1, 2011) ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Moreover, defense counsel was able to effectively elicit the same testimony to which the trial court *sua sponte* objected. During cross-examination, Sahara testified that she did not try to enter the car when Moon chased her around it, even though her car door was unlocked. Based on this testimony, we find the trial court did not abuse its discretion, and in any event, the objection had no impact. *Jackson*, 250 Ill. App. 3d at 204. Because no error occurred, we need not address this issue under plain error review. *Sims*, 192 Ill. 2d at 621.

¶ 42                                      Repetitive Testimony

¶ 43    Next, Moon argues that the trial court impermissibly allowed the State to elicit repetitive testimony from her regarding whether she showed Barnes the bald spots on her head when reporting the battery. The State responds that the issue of whether Moon showed Barnes her injuries required a longer line of questioning, since Moon testified that she suffered multiple

injuries, which were depicted by several exhibits. Because Moon also failed to preserve this issue, we will determine whether an error occurred before considering the plain error doctrine. *Naylor*, 229 Ill. 2d at 593.

¶ 44    Evidence is cumulative when it adds nothing to what was already before the trier of fact. *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). But, the admission of unnecessarily repetitive testimony is not, by that fact, reversible error. *People v. Fields*, 285 Ill. App. 3d 1020, 1027-28 (1996). "The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that court's discretion may not be overturned on appeal absent a clear abuse of discretion." *People v. Illgen*, 145 Ill. 2d 353, 364 (1991); see also *People v. Cookson*, 215 Ill. 2d 194, 213 (2005).

¶ 45    The State showed Moon the six photographs depicting her injuries and asked whether Moon had shown each injury to Barnes. *People v. Stevens*, 2014 IL 116300, ¶ 16 (observing defendant who takes stand to testify on own behalf in criminal case subjects herself to legitimate cross-examination). Moon answered unclearly or unresponsively when asked about her scalp. For instance, after confirming that she showed her scalp injuries to Barnes, she stated, "I didn't have these pictures but I was standing there, she could see." This prompted the assistant state's attorney to reiterate her questions, and the trial court at one point intervened to tell Moon to "just answer the questions," as it had wide discretion to do. *People v. Shaw*, 98 Ill. App. 3d 682, 688 (1981) ("It is the duty of the presiding judge to insure that orderly proceedings are conducted and proper decorum is maintained in the courtroom."). At multiple points, Moon avoided the State's questions as to whether she showed Barnes her scalp injuries, stating she showed Barnes her other injuries. The trial court attempted to keep Moon on subject, stating, "No, ma'am, that's not the question. The question is did you show her where the bald spots w[ere], *** did you show

that to her?" Moon ultimately testified that she did not show Barnes the bald spots on her scalp; she thought Barnes could see them. In light of the number of exhibits, and Moon's unclear and unresponsive answers, the State did not improperly elicit repetitive testimony. Accordingly, we find the trial court did not abuse its discretion by allowing the State to elicit repetitive testimony that Moon did not show her bald spots to Barnes. Because no error occurred, plain error review is unnecessary. *Sims*, 192 Ill. 2d at 621.

¶ 46                                Cumulative Prejudicial Effect

¶ 47    Lastly, Moon argues that the cumulative prejudicial effect of the trial court's alleged errors requires reversal under the plain error doctrine or, alternatively, under a theory of ineffective assistance of counsel. Because we have found that the trial court did not commit any errors, we need not consider this argument. *People v. Land*, 2011 IL App (1st) 101048, ¶ 146 (declining to consider ineffective assistance of counsel argument where there was no error).

¶ 48    Affirmed.