2019 IL App (1st) 172703-U

No. 1-17-2703

Order filed November 25, 2019

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 60006 |
| | ) | |
| ROBERT LUMPKINS, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PIERCE delivered the judgment of the court.
Justices Hyman and Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for residential burglary is affirmed where a rational trier of fact could find the property was a dwelling. The trial court did not abuse its discretion regarding the scope of the State's redirect examination of a witness and the use of a leading question, and therefore, defendant's forfeiture of those issues is honored.

¶ 2    Following a bench trial, defendant Robert Lumpkins was found guilty of residential burglary and sentenced to 10 years' imprisonment. On appeal, defendant contends that (1) the State did not prove the property he entered was a dwelling, and (2) the trial court abused its

discretion in allowing the State's redirect examination of a witness to exceed the scope of the cross-examination and include a leading question. We affirm.

¶ 3     Defendant was charged by information with one count of residential burglary (720 ILCS 5/19-3(a) (West 2016)), committed on December 25, 2016.

¶ 4     At trial, Chicago police officer Simplisio Perez testified that he and his partner, Officer Alex Coan, responded to a burglar alarm at a house on the 6300 block of South Racine Avenue (Racine house) in Chicago around 7:50 p.m. on December 25, 2016. Perez discovered a broken window on the side of the house, and stayed there while Coan went behind the house. Perez heard a noise from behind the house, and then heard the front door open and slam. He observed defendant descending the front steps and detained him.

¶ 5     On cross-examination, Perez agreed that defendant stated he was "checking" on the house. Defendant was not running, and did not possess anything resembling the proceeds of a residential burglary. Perez did not see defendant inside the house.

¶ 6     On redirect examination, the following colloquy occurred:

"Q. When you were looking at the defendant, did you notice anything about his face?

DEFENSE COUNSEL: Objection, beyond the scope.

THE COURT: Overruled.

A. Can you explain?

Q: Did he have any cuts—

THE COURT: Rephrase your question.

Q: —or anything?

A. I do remember him having small cuts.

Q. Where?

A. About his face, I believe, and his hands.

THE COURT: On the face and hands or where?

THE WITNESS: Face and hands.

THE COURT: Face and hands.

DEFENSE COUNSEL: Judge, I would object to that being beyond the scope.

THE COURT: Overruled."

¶ 7    On recross-examination, Perez acknowledged his case report did not state whether defendant had injuries on his hands.

¶ 8    Wardell Mikell testified the Racine house was held in a family trust and he was the "custodian." Around 7:50 p.m. on December 25, 2016, ADT, the company that provided security for the Racine house, informed Mikell that the alarm had been activated. Mikell told ADT to call the police, as no one was supposed to be there. Fifteen or twenty minutes later, Mikell arrived at the house and saw defendant in a police vehicle. Mikell did not know defendant and did not give him permission to enter the house.

¶ 9    In the house, Mikell discovered "the ADT system" had been removed from a wall near the back door and placed in the refrigerator. He also noted that two spray tanks and canisters of chemicals for his extermination business, along with a Playstation and other items, were scattered on the floor of a room, and a window in the room was broken. When Mikell last visited the house, approximately three days earlier, the window was intact, the spray tanks and canisters were in the closet, and the Playstation was in a kitchen vanity. Mikell identified several

photographs of the Racine house, which are in the record on appeal, and depict a washer and dryer, a small refrigerator, an exercise machine, a credenza with mail on it, the spray tanks and canisters, and drapes.

¶ 10     On cross-examination, Mikell stated he lived in the Racine house "for two years prior to the incident" and "was always in and out three to four times a week." His brother then stayed there, but had "recently" moved out when the incident occurred. Defense counsel asked whether "anyone [was] living in the home" on December 25, 2016, and Mikell explained that "I was in and out, but I hadn't been there for a couple days. So the house was vacant at that time." Mikell did not sleep at the Racine house during the three days before the incident. His mail came to the Racine house and his post office box, but he had a "business address" in Olympia Fields.

¶ 11     Defendant testified that he was convicted of residential burglary in 2012 and served eight years' imprisonment. On December 25, 2016, defendant spoke with Mikell's brother, Al, who lived in defendant's building. Later that day, defendant rode his bicycle down Racine, fell, and injured his lip. Defendant then walked past the Racine house, where he heard the sound of glass breaking and someone "jump[ing] out of a window" and into the gangway. Defendant decided to check whether anyone was home, as the Racine house resembled a building he visited during a 12-step program. Defendant also did not think anyone should have been inside the house because "Al told me that his father or somebody had passed away."

¶ 12     Defendant opened the front door, "peeked" inside, and said "hello." Then, he turned and saw a police vehicle. He walked to the vehicle, and officers approached him from the side of the house. Defendant asked the officers to call Al, but they arrested him. Defendant denied entering the residence or taking anything from it.

¶ 13   On cross-examination, defendant explained that he went to Racine to ask a friend for the address of a Christmas party, and would take the same route to work and to his sister's house. The sound of breaking glass came from the gangway, but defendant went to the front door because "witnesses" were on the street. Afterwards, he walked directly to the police vehicle because he was on parole for a burglary conviction and wanted the officers to provide documentation "saying *** I didn't commit nothing." On redirect examination, defendant stated that he wore gloves that day, and did not have cuts on his hands.

¶ 14   Following closing arguments, the trial court found defendant guilty of residential burglary. The court stated that Mikell's and Perez's "credible" testimony showed defendant entered the Racine house through a broken window, gathered property to carry away, and fled through the front door when Perez and Coan arrived. While Perez was "impeached" because his report did not mention that defendant had cuts, the court noted that defendant acknowledged injuring his face, and his testimony was otherwise unbelievable.

¶ 15   The court further explained that, "although no one may have been living in the home" when defendant entered, "a dwelling place is a building which is used or intended for use as a place of human habitation, home or residence." According to the court, the photographs of the Racine house depicted "the kinds of things that would ordinarily be found in a residence." The court concluded that, although Mikell's brother recently moved out and Mikell had a different business address, Mikell "also stayed [at the Racine house] at times" and could have "more than one home."

¶ 16    Defendant filed a posttrial motion, which challenged the sufficiency of the evidence but did not attack the trial court's evidentiary rulings. The court denied defendant's motion, and following a hearing, sentenced him to 10 years' imprisonment.

¶ 17    On appeal, defendant first argues that his conviction for residential burglary should be reduced to burglary and the cause remanded for resentencing. According to defendant, the State failed to prove beyond a reasonable doubt that the Racine house was a "dwelling" for purposes of the residential burglary statute, as the house was "vacant" on the date of the offense and no one intended to reside there within a reasonable time. The State maintains the evidence established beyond a reasonable doubt that the Racine house was a dwelling because Mikell "resided" there several times per week and physical evidence showed it was occupied.

¶ 18    Preliminarily, the parties dispute the standard of review. Defendant, relying on *People v. Roberts*, 2013 IL App (2d) 110524, contends that *de novo* review is proper because the evidence "affirmatively established" the Racine house was unoccupied, "no evidence" showed anyone intended to reside there within a reasonable time, and the only question is whether, as a matter of law, the house is a dwelling. The State posits that defendant raises disputed questions of fact, and therefore, the standard of review is whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt.

¶ 19    In *Roberts*, the defendant was convicted of residential burglary after his fingerprints were found on pipes removed from a house. *Id.* ¶¶ 1-2. Uncontested evidence showed the house was for sale, there was no purchaser, and the owners had moved out of state with no plan to return. *Id.* On appeal, the defendant argued that the house was not a " 'dwelling' within the meaning of the residential burglary statute." *Id.* ¶ 2. We reviewed the issue *de novo*, as "[t]he question

presented [was] one of statutory interpretation." *Id.* ¶ 4. Applying the statute to the facts, we held that "[t]he house defendant entered was not a 'dwelling,' but it was a building and defendant [was] therefore guilty of burglary rather than residential burglary." *Id.* ¶ 10.

¶ 20    Here, unlike in *Roberts*, defendant's contention that the Racine house was not a dwelling does not rely on undisputed facts, but on inferences drawn from Mikell's testimony. When, as here, "divergent inferences could be drawn from undisputed facts, a question of fact remains." *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 35. Therefore, we agree with the State and apply the standard of review for a challenge to the sufficiency of the evidence.

¶ 21    When reviewing a challenge to the sufficiency of the evidence, the reviewing court considers whether, viewing the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67. The trier of fact is responsible for determining witness credibility, the weight of the evidence, and the reasonable inferences to be drawn from the evidence (*People v. Wright*, 2017 IL 119561, ¶ 70), and is not required to raise all possible explanations consistent with innocence to the level of reasonable doubt (*People v. Siguenza-Brito*, 235 Ill. 2d 213, 229 (2009)). Rather, "where the evidence presented is capable of producing conflicting inferences, the matter is best left to the trier of fact for proper resolution." *People v. Campbell*, 146 Ill. 2d 363, 380 (1992). The reviewing court must draw all reasonable inferences in the State's favor. *People v. Newton*, 2018 IL 122958, ¶ 24. We will not retry the defendant, and "will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Id.*

¶ 22   Relevant here, "[a] person commits residential burglary when he or she knowingly and without authority enters *** the dwelling place of another, or any part thereof, with the intent to commit therein a felony or theft." 720 ILCS 5/19-3(a) (West 2016). The requirement for the location of the burglary to be a dwelling, as opposed to any other building, distinguishes residential burglary from burglary. See 720 ILCS 5/19-1(a) (West 2016). For purposes of the residential burglary statute, a "dwelling" is "a house, *** in which at the time of the alleged offense the owners or occupants actually reside or in their absence intend within a reasonable period of time to reside." 720 ILCS 5/2-6(b) (West 2016).

¶ 23   Defendant does not contest that he entered the Racine house without authority and intended to commit a felony or theft therein, but only challenges whether the house was a dwelling. On this issue, defendant relies on *Roberts*, while the State directs us to *People v. Burnley*, 2014 IL App (5th) 120486.

¶ 24   *Roberts*, as noted, involved uncontested evidence the defendant burglarized a house that was for sale, after the owners had moved away with no intention of returning. *Roberts*, 2013 IL App (2d) 110524, ¶¶ 1-3. We observed that "the residential burglary statute is aimed specifically at protecting the privacy and sanctity of the home," and "[t]here can be no violation of the privacy and sanctity of the home when there is no one who considers the premises in question to be his or her home (or future home)." (Internal quotation marks omitted.) *Id.* ¶ 7. As neither the owners nor anyone else intended "within a reasonable period of time to reside in the house," the house was not a dwelling for purposes of the residential burglary statute. *Id.* ¶¶ 7, 10.

¶ 25   In *Burnley*, the defendant was found guilty of residential burglary of a house in Cahokia. *Burnley*, 2014 IL App (5th) 120486, ¶¶ 1, 4. The owner of the house in Cahokia also owned a

house in Shiloh. *Id.* She "lived primarily at the Shiloh house," but kept a bed, television, table and chairs, washer and dryer, and business papers in the Cahokia house. *Id.* ¶ 5. She agreed the Cahokia house was "more or less a kind of holding place for some of [her] stuff," but would not compare it to a storage unit. *Id.* She visited the Cahokia house "[o]n occasion *** to check on it," and last visited four days before the burglary. *Id.* ¶ 6. She kept the house locked, installed a security system, and was angry about the break-in. *Id.* at ¶¶ 6-7.

¶ 26      In affirming the defendant's conviction, we observed that "[a] reasonable jury could have found that the victim had two residences, a primary one in Shiloh and a secondary one in Cahokia, both of which she was using at the same time, although perhaps for different purposes." *Id.* ¶ 16. The victim had not "permanently abandoned the Cahokia house in favor of the Shiloh house," as "many of her belongings remained there," she "frequently visited the Cahokia house," and "the house did not appear to be abandoned, vacant, or unoccupied." *Id.* ¶¶ 17-18. She was also upset when the defendant violated "the very privacy and sanctity which the residential burglary statute was designed to protect." *Id.* at ¶ 15. Given these facts, we distinguished the case from *Roberts*, where uncontested facts "clearly" established that "no one *** actually resided in the [burglarized] house, nor was there anyone who intended to reside in the house in the future." *Id.*

¶ 27      The facts in the present case more closely resemble *Burnley* than *Roberts*, and viewing those facts in the light most favorable to the State, a rational trier of fact could find the Racine house was a dwelling. Officers arrested defendant at the Racine house on December 25, 2016. The house was owned by Mikell's family trust. Mikell was the "custodian," and lived there "for two years prior to the incident." Then, Mikell's brother stayed at the house, but he "recently"

moved out sometime before the burglary. Mikell "hadn't been" to the house "for a couple days," but was "in and out" around that date and typically visited three to four times per week. As of December 25, 2016, Mikell received mail at the house, maintained its security system, and stored a Playstation and business equipment there. Photographs of the house depicted a refrigerator, washer and dryer, exercise machine, furniture, and drapes.

¶ 28    Mikell's regular presence at the Racine house, along with his mail service, security system, furnishings, and professional and personal property, all support the inference that he used the house as a dwelling. See *Burnley*, 2014 IL App (5th) 120486, ¶¶ 15-18 (inferring residency in a home from circumstantial evidence of occupation); see also *People v. McGee*, 398 Ill. App. 3d 789, 794 (2010) (finding a fire-damaged home was a dwelling where the owner locked the home, regularly returned, and kept personal belongings there). While Mikell also had a post office box and a business address in Olympia Fields, this evidence did not prove the Racine house was not a dwelling; at most, it suggested that, like the homeowner in *Burnley*, Mikell had more than one dwelling. Compare *People v. Smith*, 209 Ill. App. 3d 1091, 1095-96 (1991) (a home used for only part of the year was a dwelling) with *People v. Moore*, 2014 IL App (1st) 112592-B, ¶ 34 (apartments were not dwellings where no evidence showed anyone resided or intended to reside there during remodeling).

¶ 29    Notwithstanding, defendant argues the Racine house was not a dwelling because Mikell testified it was "vacant," and, according to defendant, "[n]o one could sleep or reside" there due to the presence of "harmful chemicals." We disagree. Mikell explained that no one was supposed to be at the house on the night of the burglary, and no evidence suggested the chemicals he stored there rendered the house uninhabitable. Thus, defendant's construction of Mikell's

testimony is speculative and attempts to improperly draw "inference[s] from the evidence in the light most favorable to himself." *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 33. On review, however, "all reasonable inferences from the evidence must be allowed in favor of the State." *People v. Baskerville*, 2012 IL 111056, ¶ 31. Because a rational trier of fact could find the Racine house was a dwelling, defendant was proven guilty beyond a reasonable doubt of residential burglary.

¶ 30    Defendant next asserts the trial court abused its discretion during Perez's redirect examination by allowing the State to (1) ask questions that exceeded the scope of cross-examination, and (2) pose a leading question.

¶ 31    Initially, the State contends, and defendant concedes, that he has forfeited both issues because neither was included in his posttrial motion. Generally, both a contemporaneous objection and a written postsentencing motion are required to preserve an issue for review. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Notwithstanding, defendant posits this court may review the alleged errors under the plain error doctrine.

¶ 32    The plain error doctrine, a "narrow and limited exception" to the general forfeiture rule, allows a reviewing court to address forfeited claims "(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or "(2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Harvey*, 2018 IL 122325, ¶ 15. Here, defendant

argues the first prong of the plain error doctrine applies. However, "[t]he first step in our analysis is to determine whether an error occurred." *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 33     Generally, the scope of cross-examination is limited to the subject matter of direct examination and "matters affecting the witness' credibility," including "subjects tending to explain, discredit, or destroy the witness' direct testimony." *People v. Lewis*, 223 Ill. 2d 393, 404 (2006). "The purpose of redirect examination is to explain new matters brought out on cross-examination." *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 43. During redirect examination, "a witness may be asked questions designed to remove unfavorable inferences or impressions raised on cross-examination." *Id.* "The scope of redirect examination is within the sound discretion of the trial court, and its ruling will not be disturbed absent a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Duff*, 374 Ill. App. 3d 599, 606 (2007). The trial court abuses its discretion only when its decision is "arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Chambers*, 2016 IL 117911, ¶ 68.

¶ 34     Here, Perez testified on direct examination that he discovered a broken window on the side of the Racine house, observed defendant descend the front steps, and detained him. On cross-examination, Perez acknowledged he did not see defendant inside the house, running from the house, or carrying anything resembling the proceeds of a residential burglary. On redirect examination, Perez agreed he saw "small cuts" on defendant's face and hands. Then, on recross-examination, Perez acknowledged his case report did not state whether defendant had injuries on his hands.

¶ 35    Defendant contends the trial court abused its discretion by allowing the State to elicit testimony regarding his appearance on redirect examination because, on cross-examination, "defense counsel never questioned Perez about [defendant's] physical appearance." The gist of the cross-examination, however, was to establish that Perez did not notice anything about defendant that suggested he entered the Racine house. The State's question on redirect examination—whether Perez saw cuts on defendant that could have been caused by the broken window—showed that Perez in fact observed circumstances suggesting defendant entered the house. Therefore, the redirect examination responded to an unfavorable inference urged by defense counsel (*Johnson*, 2013 IL App (1st) 111317, ¶ 43), and defendant's claim of error fails. Because no error occurred as to the scope of Perez's redirect examination, plain error review is unmerited and defendant's forfeiture will be honored.

¶ 36    Defendant also argues the court abused its discretion by allowing the State to ask Perez a leading question during redirect examination about whether defendant had cuts.

¶ 37    A leading question is one that "suggest[s] the answer by putting into [the witness's] mind the words or thought of the answer." *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 72. In general, "it is improper to lead a witness except on cross-examination." *Id.* However, "[t]he use of a leading question does not warrant reversal of a conviction unless it is shown that the trial court abused its discretion and that such abuse resulted in substantial injury to the defendant." *People v. Schuldt*, 217 Ill. App. 3d 534, 542 (1991). A leading question does not harm the defendant if the question did not involve material information. *Id.*

¶ 38    The transcript shows that, on redirect examination, the prosecutor asked Perez whether he "notice[d] anything about [defendant's] face" when Perez saw defendant outside the Racine

house. Defense counsel objected that the question exceeded the scope of the cross-examination. The trial court overruled the objection, but Perez asked the prosecutor to "explain" the question and the court instructed the prosecutor to "[r]ephrase." Then, the prosecutor asked whether Perez observed "cuts" or "anything" on defendant, and Perez stated he "remember[ed] [defendant] having small cuts" on his "face" and "hands."

¶ 39    According to defendant, Perez's request for the prosecutor to explain what he meant by asking whether Perez "notice[d] anything" about defendant's face shows that Perez "could not recall cuts on [defendant's] face and hands" until after hearing the leading question. Nothing in the record supports defendant's position. Read plainly, the record shows that Perez was confused by the State's initial question regarding whether he observed "anything" about defendant's face. The court then acted within its discretion to allow the State to ask a more precise question, which Perez promptly answered based on his personal recollection of seeing "small cuts" on defendant's "face" and "hands." Under these circumstances, the court's decision to allow a leading question was neither arbitrary nor unreasonable. See *Chambers*, 2016 IL 117911, ¶ 68. Because no abuse of discretion occurred, plain error review is inapplicable and defendant's forfeiture of the issue will stand.

¶ 40    As defendant has not established the trial court abused its discretion regarding the scope of Perez's redirect examination or the State's use of a leading question, we also reject his contention that trial counsel was ineffective for failing to preserve these claims for review. *People v. Moon*, 2019 IL App (1st) 161573, ¶ 47 (declining to address ineffective assistance of counsel argument where no error occurred).

¶ 41    In sum, the trial evidence was sufficient to prove defendant's guilt of residential burglary beyond a reasonable doubt. Defendant's forfeiture of his claimed errors regarding Perez's redirect examination is honored, as the trial court did not abuse its discretion.

¶ 42    Affirmed.