2021 IL App (1st) 181934-U

No. 1-18-1934

Order filed March 31, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 13633 |
| | ) | |
| CAMARI GLOVER, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for first degree murder affirmed where the record reveals no basis to disturb the trial court's findings that the State's witnesses were credible, and defendant's alternative suspect theory and alibi witnesses were not credible.

¶ 2    Following a bench trial, defendant Camari Glover was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)) and sentenced to 45 years' imprisonment. On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt as the testimony from the State's witnesses was not credible. Defendant argues that he presented credible

eyewitness testimony identifying another man as the shooter and credible alibi testimony that he was not present at the scene of the shooting. We affirm.

¶ 3                                    BACKGROUND

¶ 4     Defendant was charged with six counts of first degree murder for the shooting death of Nicholas Jackson. Prior to trial, defendant filed a motion *in limine* to introduce evidence that an alternative suspect, Zedeki Mobley, committed the murder. Defendant alleged he had been misidentified as the gunman and noted that a firearm was not recovered in this case. Defendant stated that Michael Harlan would testify he observed Mobley shoot Jackson. Defendant further stated that a few weeks after the murder, Mobley committed an aggravated vehicular hijacking and was arrested. Mobley pled guilty. Defendant asked to introduce evidence from Mobley's offense, specifically his arrest photograph and identification by his victim, to corroborate Harlan's testimony identifying Mobley as the gunman who shot Jackson. The State objected, arguing the evidence was not relevant to Jackson's murder. The trial court questioned the relevancy of the evidence, stating that it only established Mobley had a firearm. The court, however, "provisionally" granted defendant's motion and allowed him to present testimony from Mobley's victim.

¶ 5                                  State's Case

¶ 6                                 *Wanda Jackson*

¶ 7     At trial, Wanda Jackson testified that she last saw her son, Jackson, on the evening of September 4, 2011, after he got off work. Later that evening, Wanda[1] learned Jackson had been

_____

[1] We refer to Wanda Jackson by her first name to avoid confusion because she shares the same last name with the victim.

shot and taken to the hospital. After arriving at the hospital, Wanda learned Jackson had died.

¶ 8    On cross-examination, Wanda testified that on September 4, she lived in a rowhouse in the 600 block of East 133rd Street in the Altgeld Gardens complex. Jackson's girlfriend, Mary Wright, lived across the street. That afternoon, defendant's mother, later identified as Marquita Dixon, came to Wright's house to confront Wanda. Defendant's sister, Caprice,[2] had formerly dated Wanda's son, Randy Jackson, and Wanda did not want Caprice in her house. Wanda and Dixon argued. Afterwards, Wanda and Wright walked to Dixon's house, about six houses from Wright's house. Wanda later learned Wright was maced. Wright complained of having mace in her eyes, which were red.

¶ 9    That evening, Wanda observed Jackson walking through the gangway after he had gotten off work. She saw one or two men "jump" Jackson. When more men joined the fight, Wanda got "in the middle of it" and tried to pull the men off Jackson. Wanda did not recall being knocked to the ground during the fight. After the fight ended, Wanda heard gunshots. She also testified that she did not recall when she heard the shots and acknowledged she had been drinking that day. Wanda noticed defendant "out there" during the fight and when the shooting occurred. Wanda called Dixon that evening and asked her why defendant killed her son.

¶ 10    On September 7, 2011, Wanda met with Chicago police detective Marc Delfavero. Wanda did not recall telling Delfavero that Jackson was upset because someone maced Wright. She told Delfavero some men jumped her son but she did not know their names. She did not recall telling Delfavero that Quinton was one of the men who jumped Jackson. She did not know Quinton. On June 18, 2013, Wanda met with Delfavero, Detective Michael Malinowski, and an assistant State's

---

[2] Caprice's last name does not appear in the record.

attorney. Wanda did not recall telling them that she did not see the shooter as she was knocked to the ground during the altercation. She told the detectives she saw defendant on a surveillance video.

¶ 11                                        *Mary Wright*

¶ 12     Mary Wright testified that on September 4, 2011, she lived in the 600 block of East 133rd Street in the Altgeld Gardens complex. She was separated from her husband, Eddie Wright, and was dating Jackson. Despite the separation, Wright, Eddie Wright, and Jackson were all good friends. On the day in question, Wright had argued with some women and someone sprayed mace in Wright's face. Someone had called Jackson and told him what happened. About 10:30 p.m., Jackson arrived at the complex with Eddie Wright. At that time, Wright was inside her house rinsing off the mace. When Wright went outside, Jackson was already engaged in a fistfight with defendant's brother, Nate.[3] The streetlights in the complex were bright, and Wright could see what was happening. The mace was not in her eyes and it did not prevent her from seeing what was taking place. Several people gathered around the fight. Wright then heard three gunshots fired "very close" from where she was standing. She then noticed Jackson lying on the ground. Wright approached Jackson and looked around to see who fired the shots. Wright then observed defendant "skipping down the street" with a weapon in his hand. She watched defendant until she could no longer see him. She kept watching him as she did not know if he was going to turn back and shoot at everyone else.

¶ 13     Wright had known defendant for three years prior to the shooting. His family lived four houses from her house and she would see defendant every day. She identified defendant in court.

---

[3] Nate's last name does not appear in the record.

On the day of the shooting, defendant's hair was braided or twisted on one side and the other side was not styled. No one else at the scene wore the same hairstyle. Defendant was wearing blue jeans and a black sweater. Jackson was transported to Christ Hospital where he died. At the hospital, Wright informed the police of what had happened and gave them defendant's name. On September 7, 2011, Wright viewed a photo array and identified defendant "right away" as the man she observed running away with a weapon. The police showed Wright a video of the shooting. Wright testified that the video was a true and accurate recording of the incident as she remembered it. She, however, asked not to view it in court.

¶ 14    On cross-examination, Wright acknowledged Jackson was upset she had been maced. The mace was on Wright's nose, lips, and chin. She was not sprayed in her eyes and did not tell Wanda it was in her eyes. Wright told the police she was maced in the face. Jackson and Nate were the only men fighting. No one else joined the fight, but a number of people crowded around them. Wright did not observe anyone shooting a firearm as the crowd blocked her view. She was standing outside her door when she heard the gunshots. When the shots were fired the crowd quickly dispersed which opened the area and allowed Wright to see everything. After the shooting, Wright squatted down on the ground next to Jackson. From that vantage point she observed defendant skipping away from her about three to four houses down the street. Although defendant was running away from her, he did turn his face and looked back towards her for a second or two. Defendant then pulled his hood over his head and fled. Wright acknowledged she was interviewed by defense counsel and defense investigator Rosa Silva on April 21, 2017. Wright denied telling them that the person wearing the hood never faced her and never ran past her. She also denied telling them she lied to police about being maced in the face.

¶ 15                                    *Dushaunda Jackson*

¶ 16    Dushaunda Jackson acknowledged she had been convicted in 2008 for manufacturing and delivering cannabis. On September 4, Dushaunda[4] was at the Altgeld Gardens complex visiting her mother-in-law, Wanda. Dushaunda was married to Wanda's son, Randy. At some point, Dushaunda went to the store. When she returned, she learned Wright had been in an altercation. Jackson arrived at the complex about 10:25 p.m. He asked Dushaunda who maced Wright. Some men were leaning against a vehicle. One of those individuals approached Jackson. Dushaunda did not know the man. She told him Jackson was talking to her, not him. The man asked Jackson if his name was Nick. Jackson replied that it was. The man struck Jackson and the two men commenced fighting. A crowd gathered around the fight. Floodlights in the complex allowed Dushaunda to see everything that occurred.

¶ 17    Dushaunda observed defendant approach the fight from her left side. She saw defendant's face. Half of his hair was braided and the other half was "just up." Dushaunda did not observe anyone else with the same hairstyle that evening. Defendant was wearing jeans, a white T-shirt, and a black hoodie. She knew defendant from seeing him many occasions around the complex. Dushaunda identified defendant in court. On the evening in question, defendant stood slightly to Dushaunda's left and behind her shoulder. Dushaunda then heard multiple gunshots coming from her left. None of the participants in the fight or in front of her had firearms. Dushaunda then ran to Wanda's house which was located about 20 feet to the right of the fight. She turned around and observed defendant running down the street towards his mother's house. Defendant had an object

---

[4] We refer to Dushaunda Jackson by her first name to avoid confusion because she shares the same last name with the victim.

in his hand, but she could not tell what it was. Jackson was lying on the ground. Dushaunda ran to Jackson and called 911 for an ambulance.

¶ 18    Dushaunda spoke with police that evening. Two days later she spoke with Detectives Delfavero, William Meador, Devin Jones, and Isaac Lambert at the police station. Dushaunda identified defendant in a photo array. Defendant's hairstyle on the night of the shooting was different than it was in the photograph. The police showed Dushaunda a surveillance video from the complex which she felt accurately depicted what occurred on the evening of the shooting. Dushaunda identified herself and defendant in the video.

¶ 19    As the video played in court, Dushaunda pointed out Wright's house. Dushaunda identified herself standing to the left of a tree. She identified Jackson and the men fighting, both wearing white T-shirts. Jackson was wearing light-colored pants and facing the camera. Dushaunda identified defendant when he appeared in the left portion of the video screen. She then identified Jackson lying on the ground.

¶ 20    On cross-examination, Dushaunda acknowledged that she did not give the 911 dispatcher defendant's name or description. Dushaunda's main concern was to get an ambulance for Jackson. The dispatcher did not ask for the shooter's name or description. Dushaunda did not see anyone holding a handgun or firing a weapon. She did not tell the police that she noticed defendant with a firearm or that she observed him shoot anyone. She identified defendant in the photo array as the person who was standing at the scene and who ran away with something in his hand. Defendant was one of many individuals who ran from the scene following the shooting. Dushaunda ran in the opposite direction from defendant. Dushaunda did not recall knowing anyone named Quinton. She

did not tell Delfavero that Quinton had caused problems for her family. Nor did she tell the detective that Jackson was fighting Quinton or that Quinton's brother punched Jackson.

¶ 21    The trial court asked Dushaunda to watch the video again and verify which individual was Jackson and the man he was fighting. The court also asked the prosecutor to play the video and for Dushaunda to tell him to stop the video as soon as she observed defendant appear. She did so. The court noted that defendant was the second person to the left of a thick tree on the left foreground wearing a dark covering over a light T-shirt. Per the court's direction, the prosecutor started and stopped the video again. The court pointed to a specific person and asked Dushaunda who was that particular individual. She testified it was defendant. Per defense counsel's follow-up questioning, Dushaunda acknowledged that the video did not depict all of the facial features or hairstyles of all the individuals.

¶ 22                                *Tempo Gibson*

¶ 23    Tempo Gibson testified that on September 4 she was at the Altgeld Gardens complex visiting Wanda. Wanda's son, Randy, is Gibson's brother, and Jackson was her stepbrother. Gibson learned Wright had been maced during an altercation. Gibson noticed Jackson arrive at the complex with a man whom she did not know. Jackson was upset and wanted to know who maced Wright. Jackson began physically fighting with another man Gibson did not know. Gibson was standing about 10 feet from the fight. The streetlights were on, and she had no difficulty seeing what occurred and was able to identify the individuals she knew and did not know. As the fight continued, a man walked up, pointed a handgun, and fired gunshots. Gibson observed the first shot being fired, then she ran to Wright's house. Wright's door was locked so she ran in the other direction. In court, Gibson identified defendant as the shooter. She had seen defendant all day that

day. Prior to that day she had also seen defendant around the complex, but she did not know him. Gibson testified that on the day of the shooting, defendant wore a black hoodie with a white shirt underneath. Half of his hair was in braids and half was an afro. After the shooting, defendant ran down the walkway.

¶ 24    Two days later, Gibson went to the police station and told them what happened. She viewed a photo array but was not able to identify anyone. On June 19, 2013, Gibson viewed a live lineup and identified defendant. Prior to viewing the lineup, Gibson signed an acknowledgement that she was not required to identify anyone, and that the suspect may or may not be in the lineup. Gibson noted that defendant's hairstyle was different at the time of the lineup than it was on the night of the shooting. After Gibson viewed the lineup, the police showed her a photograph which she identified as defendant. Gibson signed the photograph and wrote on it "This is how Camari Glover look [*sic*] the day I seen him shoot Nick Jackson." In the photograph, defendant's hair was partially braided. The police displayed for Gibson a video that was a true and accurate recording of the shooting. They also asked her to view a photograph taken from the video in which she identified herself running towards Wright's house and where defendant was standing next to the fight. She initially testified that the officer told her defendant's name before the lineup, but then later testified she was unsure of whether it was before or after the lineup when she became aware of defendant's name. No one told Gibson who the shooter was in the lineup or who to identify.

¶ 25    On cross-examination, Gibson testified she was unsure if she learned of defendant's name at the police station on September 6, 2011, or June 19, 2013. She acknowledged defendant's photograph was included in the photo array which she viewed on September 6 but did not identify defendant at that time. On the evening of the shooting, Gibson did drink some alcohol but not

much. Gibson was "not sure" if she told Detective Lambert she observed a large group of African-American males outside with weapons. She was also "unsure" if she told Lambert she heard three gunshots but did not see the actual shooting. Gibson testified, "I seen the shooting. I was standing right there." Gibson was unsure if she told Delfavero that she heard four gunshots.

¶ 26    Gibson further testified that Wright was maced on her nose, lips, and chin. The mace did not get into Wright's eyes. Gibson denied knowing anyone named Quinton. Gibson acknowledged she had only a second or two to observe the shooter. She further acknowledged that when she testified before the grand jury, she might have said that when she could not enter Wright's house, she turned around and saw Jackson on the ground, but did not see where defendant had gone. Gibson testified that when she arrived at the police station on June 19, 2013, the police first showed her the photograph of defendant with his hair partially braided, and then she viewed the live lineup.

¶ 27                    *Forensic Investigator Brian Smith*

¶ 28    Chicago police forensic investigator Brian Smith testified that he investigated the crime scene at 1:30 a.m. on September 5. Smith photographed the scene and recovered three .45-caliber cartridge cases. He also recovered plastic cups, beer cans, glass bottles, a plastic bottle, an open bag of cat food, a stainless-steel razor, and a bloody shirt and towel.

¶ 29                            *Stipulations*

¶ 30    The State presented a stipulation that Assistant Cook County Medical Examiner Adrienne Segovia performed an autopsy on Jackson. The autopsy revealed Jackson sustained four gunshot wounds, two to his back, one to his chest, and a graze wound to his left arm. Segovia was able to recover one bullet from Jackson's body. Segovia concluded that the cause of death was multiple gunshot wounds and the manner of death was homicide.

¶ 31     The State also presented a stipulation that firearms expert Jennifer Hanna examined three RWS .45-caliber fired cartridge cases and determined they were fired from the same firearm. She also examined the fired bullet recovered from Jackson and determined it was a .45-caliber bullet.

¶ 32     The State presented a stipulation that fingerprint analyst Jeanne Hutcherson examined numerous items collected from the scene including 12 plastic cups, 3 aluminum cans, 3 glass bottles, 2 plastic bags, a plastic bottle, a bottle cap, a foil containing cat treats, and a razor blade. Hutcherson found no latent fingerprints suitable for comparison on any of the items except for one print on one plastic cup which did not reveal an identification when compared to defendant's prints.

¶ 33     At the end of the State's case, surveillance video and photographs were also admitted into evidence. The video, recorded by a police observation device (POD) camera, depicts Jackson arriving at the complex. Jackson is approached by a man wearing a white T-shirt, and the two men begin fighting. A crowd of about 15 people gathered around the men. It appears others may have joined the fight, but it is difficult to decipher because of the crowd. About one minute into the fight, a person walks down the sidewalk approaching the alteraction wearing jeans and a dark-colored hoodie partially zipped with a white T-shirt underneath. The individual walks directly up to the fight, extends his arm, and a flash is visible. The crowd disperses and runs in various directions. The gunman turns around, makes a little skip, then runs in the direction from which he came. Jackson is lying on the ground motionless. Facial features, however, are not visible on the video. Dushaunda and Gibson identified the same person on the video as defendant.

¶ 34     In a motion for a directed finding, defense counsel argued that the State's witnesses lacked credibility and reliability, and that their testimony was inconsistent with each other and with what they had related to other individuals. The trial court denied the motion.

¶ 35                                Defendant's Case

¶ 36                                *Michael Harlan*

¶ 37     Michael Harlan, an assistant director of security at St. Bernard Hospital, testified he knew defendant and identified him in court. On September 4, 2011, Harlan lived six or seven doors down from where the shooting occurred. Harlan observed the shooting while standing outside on his porch. The rowhouses were narrow in width, and Harlan was able to see the location of the shooting without much obstruction. He testified that defendant was not the shooter. Harlan knew the gunman by his nickname, "Nephew." Harlan did not know Nephew's real name. Harlan had known of Nephew for approximately eight or nine years. In court, Harlan identified photographs of Nephew. Harlan viewed the surveillance video beginning about 10 minutes prior to the shooting. As the video played, Harlan identified a man sitting alone on a bench as his brother, Nathan Willis. Harlan also identified Arsenio Paraharm. Harlan identified Nephew rising from a bench wearing a black hoodie, then walking past Harlan's house. Nephew's hair was styled half in cornrows or braids, and the other half was natural. It was a common hairstyle in the complex and several men wore similar hairstyles that evening. Harlan observed Nephew fire the handgun. Harlan did not observe defendant in the area on the night of the shooting.

¶ 38     Harlan's brother told him a fight was taking place. On the video, about two minutes before the shooting, Harlan identified a man wearing a black hoodie, light T-shirt and blue jeans as Nephew. Harlan identified another man wearing a white T-shirt as Nephew's uncle, Stacey Madden. Paraharm was standing to the right of Nephew wearing a black T-shirt and dark pants. When Harlan heard the gunshots, he stepped inside his door and held it open for his brother to

enter the house. After the gunshots, Nephew ran past them and entered a house on the corner known to be a gang hangout. Harlan identified the man running on the video as Nephew.

¶ 39    Harlan watched a portion of the video again and identified Jackson walking towards Wright's house. Harlan testified that the video depicts a large man wearing a black T-shirt and jeans handing a handgun to Jackson. He then testified that he did not see anything in Jackson's hand on the video, but noticed the large man holding a firearm. Harlan did not know the large man but had noticed him around the neighborhood quite often. A couple of people had firearms that night. Harlan continued watching the video and identified Jackson talking to a man, then punching that man in the face. Harlan did not know the man who was fighting with Jackson. He denied it was his brother or defendant's brother. Defense counsel asked Harlan if it could be a man named Quinton. Harlan testified that the more he talked about it, his memory returned, and the man fighting Jackson was Quinton Young. Harlan identified Nephew approaching the fight. While watching the video, Harlan claimed Nephew was telling everyone to "get back." Harlan testified that Nephew fired the handgun then ran towards Harlan's house. The crowd dispersed. Shortly after the shooting, Harlan learned Nephew had been arrested. He thought Nephew was arrested for Jackson's murder. Defendant lived in Indiana. Harlan saw defendant at the complex once or twice a week.

¶ 40    Harlan further testified that defense counsel and her investigator interviewed him and showed him a photograph of defendant on February 2, 2017. Harlan identified defendant in the photograph, signed it, and wrote "This is not the shooter. He was not there." The investigator also showed Harlan photographs of Nephew. Harlan identified Nephew as the shooter but refused to sign the photos at that time as he did not want to get involved. Harlan testified:

"I know I played a big part in this and I think about my life outside of here. I really didn't even want to be here so I been avoiding this situation and was trying my best not to be a part of it because I know for sure that I knew exactly what happened and I was there."

Harlan never went to the police as he did not want to "deal with the aftermath."

¶ 41    On cross-examination, Harlan acknowledged that he did not go to the area where the fight was taking place. Harlan also testified that he does not appear in the surveillance video. Harlan was friends with both defendant and Nephew. Harlan learned defendant was arrested for Jackson's murder when defense counsel interviewed him in 2017. Harlan knew defendant did not commit the murder, but did not go to the police. At trial, Harlan still did not know Nephew's real name, but knew his face.

¶ 42    On redirect examination, Harlan again viewed the video. He identified Nephew as the shooter standing on the left side of the screen near the big tree. According to Harlan, the video depicted Nephew as he "did a little skip" then he ran towards Harlan's house. Harlan testified he was 100% certain the shooter was Nephew and not defendant.

¶ 43                                     *Kellee Webb*

¶ 44    Kellee Webb testified that on September 21, 2011, her friend, Zedeki Mobley, called and asked her to give him a ride. She agreed. Webb and her friend, Derrick Pointer, who was sitting in her passenger seat, picked up Mobley and two of his friends from an address Mobley had provided to her. Mobley had a handgun sticking out of his waistband. Webb drove to an address in Dolton which Mobley had given to her. Mobley and his friends exited Webb's vehicle and went down an alley. When they returned, Mobley went to Webb's side of the vehicle and his two friends went to the passenger's side. Mobley's friends pointed a firearm at Pointer. Mobley opened Webb's door

and told her to exit her vehicle. Mobley no longer had the handgun on him. Mobley and his friends drove away in Webb's vehicle. Webb filed a police report, but later dropped the charges as her vehicle was returned to her. In court, Webb identified a photograph of Mobley. When presented with three photographs which Harlan had identified as depicting Nephew, Webb testified that the same photographs depicted Mobley.

¶ 45                                    *Detective Dave Crudup*

¶ 46    Dolton police detective Dave Crudup testified that he investigated the aggravated vehicular hijacking of Webb. Mobley was arrested for that offense on October 3, 2011. In court, Crudup confirmed that Mobley's arrest record included a mug shot from a prior arrest. Crudup then identified three photographs – which Harlan had identified as depicting Nephew – as "[t]he defendant who's present in court, Zedeki Mobley." When asked whether the defendant in the courtroom was Zedeki Mobley or Camari Glover, Crudup replied that he made a mistake; he testified that the defendant in the courtroom was Glover, who was not the man in the photographs.

¶ 47                                    *Jarrmayne Huskey*

¶ 48    Jarrmayne Huskey testified that he knew defendant from when they both lived in Altgeld Gardens. He identified defendant in court. On the night of September 4, 2011, Huskey and defendant were standing on a corner in the complex talking with three women – Theresa, Dominicka,[5] and Nakiya Smith. They were near Smith's house, about four houses from Huskey's house. About 10:23 p.m., Huskey heard gunshots. Huskey and defendant ran to Huskey's house and entered his home. As they ran, defendant fell and Huskey picked him up. The women also ran, but Huskey did not see where they had gone. In court, Huskey identified a photograph depicting

---

[5] Theresa's and Dominicka's last names do not appear in the record.

the corner where they were standing and his house down the row. On the surveillance video, Huskey identified himself and defendant running around a corner heading towards Huskey's house.

¶ 49　On cross-examination, Huskey testified that he was too far from the shooting to see what had occurred. He could see many people were at the location of the shooting, but he could not see their faces as it was dark. There was a lot of commotion and numerous individuals walking back and forth. Huskey was aware defendant was arrested for the murder in 2013, but never spoke with police.

¶ 50　　　　　　　　　　　　*Nakiya Smith*

¶ 51　Nakiya Smith testified she knew who defendant was from seeing him often but did not have a "personal relationship" with him. She identified defendant in court. Smith lived in Altgeld Gardens, and defendant and Huskey were her neighbors. About 10 p.m. on September 4, Smith was standing outside her house talking with defendant, Huskey, her friend Theresa, and another woman whose name she could not recall. Smith heard a commotion and people arguing, but was not able to observe what was taking place. About 10:20 p.m., Smith heard gunshots. She then ran inside her house. Defendant and Huskey ran towards Huskey's house. Smith did not know where the other women had gone.

¶ 52　　　　　　　　　　　　*Arsenio Paraharm*

¶ 53　Arsenio Paraharm testified he was friends with defendant and identified him in court. During the day on September 4, Paraharm observed Jackson's mother, Wanda, and defendant's sister, Caprice, arguing in front of defendant's house. The women began fighting and Caprice knocked Wanda into the bushes. Defendant broke up the fight. Defendant sat down with Paraharm

and others for a minute and joked about the women's fight. Defendant then walked to Huskey's house. Paraharm could not recall if Huskey had been at defendant's house at that time or not. Paraharm testified that the rest of the day he stayed outside by his house, a couple of doors down from defendant's house. During the evening, Paraharm was standing on the sidewalk between his house and the benches, talking with friends. There were many people outside at the time. Paraharm heard a loud commotion at the other end of the rowhouses, near Wanda's and Wright's houses. He observed arms swinging in a crowd, but did not know what was occurring. Paraharm then heard gunshots and everyone scattered. Paraharm ran inside his house. Paraharm never noticed defendant return to the area before the shooting. He did not observe defendant or anyone else with a handgun that day.

¶ 54 On cross-examination, Paraharm testified that he used to see defendant at the complex almost every day. Paraharm denied there was "bad blood" between Jackson's and defendant's family. Paraharm did not know how far he was from the shooting, but knew it was much farther than the distance to the courtroom door of 48 feet. Paraharm acknowledged he knew defendant's brother, Jerry Freeman. Paraharm's friend, Nate Willis, told him that the defense investigator was looking for him. Paraharm did not recall seeing Willis on the night of the shooting.

¶ 55 Pursuant to questioning from the court, Paraharm denied knowing anyone named Nephew, Zedeki Mobley, Stacey Madden, or anyone else who lived in the complex named Arsenio.

¶ 56 *Jerry Freeman*

¶ 57 Jerry Freeman, defendant's brother, testified that on September 4 he was living at his mother's house in Altgeld Gardens. That morning, he heard his mother and sister arguing with Wanda outside their house. Defendant broke up the fight, then walked to Huskey's house. Later

that evening, about 10 to 12 minutes before the shooting, Freeman observed defendant and Huskey near a corner, walking from Huskey's house with two women. Freeman walked to where they were, then walked home. Defendant remained near Huskey's house.

¶ 58    While standing in front of his own house, Freeman observed Jackson arrive at the complex. Jackson was intoxicated, very vocal, and very aggressive. Jackson stated, "I'm here," then said "why everybody think my brother shot up the block, it was me." Jackson approached a man, exchanged words with him, then swung at him. Jackson and the man began fighting. Jackson's girlfriend (Wright) struck the other man with a beer bottle. A crowd of about 10 people gathered around the fight. Defendant was not in the area. Jackson ended up on the ground. A man who was with Jackson shot a pistol.

¶ 59    While watching the surveillance video in court, Freeman pointed out a man in a black T-shirt and identified that man as the one with the pistol who fired the first shot. That shot went through Freeman's friend's house. Jackson unsuccessfully reached for the gun. A crowd migrated towards the man who fired the shot, and someone shot Jackson in retaliation for the initial gunshot. Freeman testified that the video depicted a man in a black hoodie run up and shoot Jackson while he was laying on the ground. Freeman did not know who the man in the black hoodie was and denied it was defendant. Defendant was not in the area at the time of the shooting. The crowd scattered and ran. Freeman's mother pulled him and his sister inside their house. Freeman did not see defendant until the next day.

¶ 60    On cross-examination, Freeman acknowledged that he never went to the police after defendant was arrested and never told them what he observed on the night of the shooting. Freeman told the prosecutor to ask him "the right question" and "no trick questions." The prosecutor asked

Freeman if he saw Huskey in court. Freeman was evasive. The court asked Freeman "[d]id you see him today, yes or no?" Freeman testified "I probably seen him today."

¶ 61 On redirect examination, Freeman testified that he did not go to the police after defendant was arrested as defendant was arrested in Indiana on another charge. No one interviewed Freeman and he did not know to whom he should relate his story. Freeman denied that he discussed his testimony with Huskey at the courthouse.

¶ 62 *Sergeant William Meador*

¶ 63 Chicago police sergeant William Meador testified that during an interview on September 5, 2011, Dushaunda informed him that defendant was involved in a physical altercation with Jackson and defendant ran from the scene after shots were fired. Meador did not recall if Dushaunda told him defendant had an object in his hand, and his police report did not indicate she told him so. On cross-examination, Meador testified he had shown Dushaunda the surveillance video after she told him what she observed on September 4.

¶ 64 *Sergeant Isaac Lambert*

¶ 65 Chicago police sergeant Isaac Lambert testified that during an interview on September 6, 2011, Gibson told him she observed a large group of men outside with handguns. Gibson also told him she did not observe the actual shooting. On cross-examination, Lambert testified Gibson was shown the surveillance video after she told him what she observed on September 4.

¶ 66 *Detective Marc Delfavero*

¶ 67 Detective Delfavero testified that during an interview on September 4 or 5, 2011, Wanda told him Jackson was fighting with a man when Quinton, a boy she knew from the neighborhood, joined the fight to help beat up Jackson. Wanda stated that she ran over to help and was punched

by an unknown individual. During an interview on June 18, 2013, Wanda told Delfavero she did not see the shooter run away because she was knocked to the ground during the altercation. Wanda stated that she learned defendant was the person who killed her son, and she contacted his mother.

¶ 68    During an interview on September 6, 2011, Dushaunda told Delfavero that Quinton hit Jackson's brother, Rubin, with a bottle a few months before the shooting. She also stated that Quinton's brother punched Jackson on the night of the shooting. Dushaunda said Quinton had a short haircut, was 5 feet 9 inches to 5 feet 10 inches tall, and weighed 150 to 170 pounds. Dushaunda stated that Quinton was fighting Jackson and wearing a white T-shirt. Also on September 6, Gibson told Delfavero the original dispute on September 4 was a fight over a man between her, Caprice, and Tone, and one of the women sprayed Wright and her baby with mace. Gibson said Wright then called Jackson, Eddie Wright, and another man.

¶ 69                          *Investigator Rosa Silva*

¶ 70    Rosa Silva, an investigator with the office of the Cook County Public Defender, testified that she and defense counsel interviewed Wright on April 21, 2017. Wright told them that after the gunshots, the person with the hood up never turned their face toward her and never ran past her. Wright also told them that she had told the police she was maced in the face, but that was not true.

¶ 71    On cross-examination, Silva acknowledged she typed a summary of her interview with Wright after the fact and never showed it to Wright for her review. Wright refused to meet with Silva a second time. Silva admitted that her summary, in its entirety, stated as follows:

"Mary Wright stated that Sugar maced her, but the mace did not get into her eyes. Mary Wright stated that she told the police that she was maced in the face, but this was not true.

Mary Wright stated that she did not really have very much mace on her face from that fight."

Silva acknowledged that during an interview on February 2, 2017, Harlan told her that the man who committed the shooting was currently in the Illinois Department of Corrections (IDOC) on unrelated charges.

¶ 72                                         *Litigation Coordinator Alexis Catlett Webb*

¶ 73    Alexis Catlett Webb, litigation coordinator for the IDOC facility in Danville, testified that in 2017, defense counsel contacted her to arrange a meeting with Mobley, an inmate at the facility. Webb did not allow the interview as counsel was not Mobley's attorney. In accordance with IDOC procedure, counsel sent a letter to Mobley, asking if he would be willing to speak with Silva. Mobley declined to speak with her. In court, Webb identified photographs of Mobley.

¶ 74                                                  *Stipulations*

¶ 75    Defendant presented a stipulation that Cook County investigator McDermott[6] would testify that on May 19, 2014, he collected a buccal swab from defendant. Defendant presented additional stipulations that Elizabeth Zawicki, Brian Schoon, and Wendy Gruhl, DNA analysts with the Illinois State Police, analyzed the numerous items collected at the scene. Many of the items contained insufficient DNA to analyze. For those items that contained sufficient DNA profiles for analysis, defendant was excluded from being a contributor to those profiles.

¶ 76    Defendant also presented a certified copy of Mobley's conviction indicating that on July 3, 2012, Mobley pled guilty to an amended charge of armed robbery without a firearm and was sentenced to six years' imprisonment.

---

[6] McDermott's first name does not appear in the record.

¶ 77                                Closing Arguments

¶ 78    In closing, defense counsel argued that Wright, Dushaunda, and Gibson were wrong when they identified defendant as the shooter, and that Mobley was the shooter. Counsel claimed defendant and Mobley resembled each other, which was demonstrated when Crudup mistakenly identified defendant as Mobley in court. Counsel argued that the State's witnesses were unreliable. In response, the State argued that Wright, Dushaunda, and Gibson knew defendant, their identifications of him were credible, and defendant's alibi witnesses were not credible. The State further argued that Harlan was not credible, he was the only witness who knew Mobley and claimed to have seen him at the complex, and his testimony that defendant did not live at the complex and was rarely there was contradicted by the State's and defendant's witnesses.

¶ 79                            Trial Court's Review of Testimony

¶ 80    The trial court reviewed the testimony from all the witnesses in detail, beginning with defendant's witnesses. The court noted that Harlan was the only person who testified that he observed the shooter enter a specific house after the shooting. Yet, Harlan, an assistant director of security at a well-known hospital, did nothing. The court also noted that Harlan testified Paraharm was near the benches at the same time as Nephew, but Paraharm never mentioned Nephew being there. The court stated, "I do not believe Michael Harlan. I don't think I will ever believe Michael Harlan. His testimony was utterly unworthy of belief."

¶ 81    The court stated that the admissibility of the vehicular hijacking testimony from Kellee Webb and Detective Crudup was "beyond speculative." It found that their testimony "had nothing to do with this case at all" and was "beyond irrelevant."

¶ 82    The court stated that Paraharm had "every opportunity" to testify that the shooter was Nephew, not defendant, but was not asked to do so. The court found that Freeman had difficulty answering questions, accused the State of trying to trick him on several straightforward questions, and was "beyond defensive." The court noted that neither Paraharm or Freeman were shown a photograph of Nephew, and stated that it did not believe either of them.

¶ 83    The court found it "curious" that Huskey and defendant were the only people running in the portion of the video identified by Huskey. The court stated that no one was fleeing with them at that juncture, and no one else was fleeing in that area of the neighborhood. The court questioned how Huskey and Nakiya Smith, who did not witness the shooting, were able to recall the details of that night. It noted that Smith's testimony happened "to coincide exactly" with Huskey's. The court concluded their testimony was "[d]ifficult to credit" and it did "not believe them."

¶ 84    The court stated that, even if it did not believe certain aspects of defendant's evidence, it was still the State's burden to prove him guilty beyond a reasonable doubt. The court found that the video corroborated Wright's testimony that the shooter was "skipping down the street" with a handgun in his hand and that her testimony was credible. The court noted Wright's testimony was impeached by the testimony that she told the police that the shooter never ran past her and that he had his hood up. She was also impeached about lying to the police about being maced in the face. The court further noted, however, that Wright testified on redirect examination that the shooter placed his hood up as he fled, and that Silva acknowledged Wright told police the mace got on her face. The court concluded that it had "no reason to disbelieve" Wright.

¶ 85    The court found that the individual Dushaunda identified on the video as defendant "was clearly the shooter." The court noted Dushaunda was impeached by Meador's testimony that she

told him the offender had nothing in his hand. The court found, however, that whether or not Dushaunda saw an object in the person's hand, the offender had the weapon that killed Jackson in his hand. In addition, the court noted that Gibson testified she had seen defendant all day and that he was the person she observed who approached the fight and fired a handgun.

¶ 86 The court found that Wright and Dushaunda had no difficulty identifying defendant in the photo array as the person they observed running from the scene and whom Dushaunda identified as the person who shot and killed Jackson. The court noted Gibson did not identify defendant in the photo array two days after the shooting but identified him in the lineup in 2013. The court found that the lineup was not suggestive. It also found that when Gibson was asked if she viewed a photograph of defendant before or after she viewed the lineup, she was "mistaken regarding the timing."

¶ 87 Conviction, Posttrial Motion, and Sentencing

¶ 88 The court found that Wright, Gibson, Dushaunda and Wanda "testified truthfully and credibly," and that their testimony proved defendant guilty beyond a reasonable doubt of all six counts of first degree murder. The court merged the counts into count V, which charged that defendant personally discharged a firearm during the offense which caused Jackson's death.

¶ 89 In a lengthy posttrial motion, defendant argued, *inter alia*, that the State failed to prove him guilty beyond a reasonable doubt because the identifications of him by the State's witnesses were unreliable, and their testimony was impeached, inconsistent, and not credible. Defendant further argued that he presented credible evidence of an alternative suspect, Mobley, through Harlan's credible testimony, and that the testimony regarding Mobley's aggravated vehicular hijacking was

relevant. In addition, defendant argued that the testimony from his alibi witnesses was credible, consistent, and unimpeached. The trial court denied the motion.

¶ 90    The trial court sentenced defendant to the minimum term of 20 years' imprisonment for the murder and an additional 25-year mandatory sentencing enhancement for personally discharging a firearm that caused Jackson's death, for an aggregate sentence of 45 years in prison.

¶ 91                                    ANALYSIS

¶ 92    On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt as the State's witnesses were thoroughly impeached, their testimony was not credible, and their identifications of him were not reliable. Defendant argues that he presented credible evidence that Mobley was the shooter and credible alibi testimony that he was not present at the scene of the shooting. Defendant claims the trial court's findings did not support its credibility determinations, and the court disregarded flaws in the testimony of the State's witnesses.

¶ 93    When defendant claims that the evidence is insufficient to sustain his conviction, this court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense established beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). This standard applies whether the evidence is direct or circumstantial, and does not allow this court to substitute its judgment for that of the fact finder on issues involving witness credibility and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). Under this standard, all reasonable inferences from the evidence must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42.

¶ 94    In a bench trial, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences from therein. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In weighing the evidence, the fact finder is not required to disregard the inferences which naturally flow from that evidence, nor must it search for any possible explanation consistent with innocence and raise it to the level of reasonable doubt. *Jackson*, 232 Ill. 2d at 281. We will not reverse a criminal conviction based upon insufficient evidence unless the evidence is so improbable or unsatisfactory that there is reasonable doubt as to defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 95    To prove defendant guilty of first degree murder as charged in this case, the State was required to establish that, without lawful justification, he intentionally or knowingly shot and killed Jackson while armed with a firearm, and that he personally discharged the firearm which proximately caused Jackson's death. 720 ILCS 5/9-1(a)(1) (West 2010).

¶ 96    Here, viewed in the light most favorable to the State, the record demonstrates that the evidence was sufficient for the trial court to find defendant guilty beyond a reasonable doubt for murdering Jackson. Gibson, Wright, and Dushaunda all testified that they observed defendant at the scene at the time of the shooting and they all identified defendant in court. Wanda also observed defendant at the scene at the time of the shooting. Gibson testified that while Jackson was engaged in a fight, she observed defendant walk up to the fight, point a handgun, and fire gunshots. After the shooting, Gibson observed defendant run down the walkway. Gibson knew defendant from seeing him around the complex, and saw him all day on the day in question. In a photograph from the surveillance video, Gibson identified herself running towards Wright's house and defendant standing next to the fight. Gibson also identified defendant in a live lineup and identified a

photograph of defendant which depicted how he appeared at the time of the shooting with his hair partially braided.

¶ 97    Wright testified that immediately after the shooting, she observed defendant "skipping down the street" with a handgun in his hand. As defendant ran away, he turned his face and looked back towards Wright for a second or two. Defendant then pulled his hood over his head and fled. Wright had known defendant for three years and would see him at the complex every day. She gave the police defendant's name at the hospital. Three days after the shooting, Wright viewed a photo array and identified defendant "right away" as the individual she observed running with a handgun.

¶ 98    Dushaunda testified that defendant approached the fight from her left side and stood behind her shoulder. As defendant would be coming around the complex on many occasions, she knew him.  On the night in question, prior to the shooting she was able to clearly observe his face. Dushaunda then heard multiple gunshots coming from her left. She ran to Wanda's house 20 feet away, turned around, and observed defendant running down the street towards his mother's house with an object in his hand. Two days later she identified defendant in a photo array as the person who ran from the scene with something in his hand. Dushaunda identified herself and defendant on the surveillance video at the time of the shooting. The trial court noted where defendant was standing at the scene, and that he was wearing a dark covering over a light T-shirt. The three female witnesses provided similar descriptions of defendant's clothing. Gibson testified he was wearing a black hoodie with a white shirt underneath, Wright testified he was wearing blue jeans and a black sweater, and Dushaunda testified he was wearing jeans, a white T-shirt, and a black hoodie.

All three women testified that half of defendant's hair was in braids and the other half was not styled. Wright and Dushaunda did not see anyone else at the scene with the same hairstyle.

¶ 99     The trial court reviewed the testimony of all the witnesses in detail and found that Wanda, Wright, Dushaunda, and Gibson "testified truthfully and credibly." The court specifically found that the video corroborated Wright's testimony that the shooter was "skipping down the street." It also found that the individual Dushaunda identified on the video as defendant "was clearly the shooter." It was the trial court's responsibility to weigh the evidence and determine the credibility of the witnesses. *Siguenza-Brito*, 235 Ill. 2d at 228. The court concluded that the testimony from Wright, Dushaunda and Gibson proved defendant guilty beyond a reasonable doubt. Based on this record, we find no grounds to disturb the trial court's determination.

¶ 100   In reaching this conclusion, we find no merit in defendant's argument that the testimony from the State's witnesses was not credible as they were impeached and their identifications were not reliable. The testimony of a single witness is sufficient to sustain a conviction where it is positive and credible, even when it is contradicted by defendant. *People v. Gray*, 2017 IL 120958, ¶ 36. A conviction will not be reversed simply due to the fact that the evidence was contradictory, or defendant claims a witness was not credible. *Id.* "[C]ontradictory testimony does not necessarily destroy the credibility of a witness[.]" *Id.* ¶ 47. It is the duty of the factfinder to determine if and when the witness testified truthfully, and how flaws in part of the testimony affected the credibility of the whole testimony. *Id.*

¶ 101   The record demonstrates that the trial court considered the same impeachment and identification challenges defendant raises on appeal and found them unpersuasive. Defendant argues that Gibson's testimony stating that she observed the shooting was impeached by Detective

Lambert's testimony when she told him she did not observe the shooting and that she observed a large group of African-American males outside with handguns. The record demonstrates, however, that on cross-examination, Gibson testified that she was "not sure" if she told Lambert she observed a group of men with handguns and "unsure" if she told him she heard three shots but did not see the actual shooting. Immediately thereafter, Gibson testified, "I seen the shooting. I was standing right there." Defendant further argues that Gibson's identification was unreliable as she had only seconds to view the shooter, she did not identify anyone in the photo array, and her lineup identification was tainted where the police told her defendant's name and had shown her his photograph. The trial court specifically noted that Gibson did not identify defendant in the photo array, found that the lineup was not suggestive, and found that Gibson was "mistaken regarding the timing" of when she viewed the photograph. The court determined that any flaws in Gibson's testimony did not affect her credibility, and we find no reason to disturb that finding. *Gray*, 2017 IL 120958, ¶ 47.

¶ 102 Similarly, the record sets forth that the court acknowledged that both Wright and Dushaunda were impeached by testimony from the detectives regarding information they provided the police during their initial interviews. The court found, however, that the impeachments were insignificant and did not affect the credibility of their testimony. *Gray*, 2017 IL 120958, ¶ 47. Moreover, the court expressly found that Wright and Dushaunda had no difficulty identifying defendant as the individual they noticed running from the scene. Both women knew defendant from the complex. Wright had seen defendant every day and Dushaunda had seen him on many occasions. The veracity of their testimony and the reliability of their identifications were

determinations within the province of the trial court, and we find no basis to disturb its rulings. *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 103   Defendant's challenge to Wanda's credibility is also unpersuasive. Defendant argues that Wanda was impeached by Delfavero's testimony that she told him she was knocked to the ground when she tried to break up Jackson's fight. Defendant also claims Wanda and Dushaunda were not credible because they testified they did not know Quinton but had mentioned him to the detectives. We find it significant to point out that the State called Wanda solely as a "life and death" witness – *i.e.*, to establish the identity of the deceased and the fact that he is deceased (*People v. Cannon*, 49 Ill. 2d 162, 167 (1971)) – and did not present any substantive testimony from her. The record further demonstrates no significance was ever established as to who Quinton was or what, if anything, he had to do with Jackson's murder. The trial court found these impeachments were of no import, and the record supports that finding.

¶ 104   We also find no merit in defendant's contention that he presented credible evidence that Mobley was the shooter and credible alibi testimony that he was not present at the scene of the shooting. Defendant maintains that Harlan credibly testified that Mobley was the shooter and that defendant was not present. Defendant argues that he and Mobley resembled each other. He further argues that the evidence regarding Mobley's vehicular hijacking 17 days after the murder was relevant as it established Mobley had access to a handgun at the time of the murder.

¶ 105   In regard to his alibi, defendant argues that Huskey and Nakiya Smith provided credible, unimpeached testimony that defendant was standing on a corner with them when they heard the gunshots and fled to Huskey's house. He claims that Paraharm and Freeman corroborated his alibi when they testified that defendant left his house and went to Huskey's house. He further notes that

Freeman testified that 10 minutes prior to the shooting, he noticed defendant and Huskey coming from Huskey's house. Freeman also testified that he observed an unknown person commit the shooting.

¶ 106 The trial court rejected these same arguments at trial and when it denied defendant's posttrial motion. The court adamantly stated that it did "not believe Michael Harlan" and that "[h]is testimony was utterly unworthy of belief." See *People v. Moon*, 2019 IL App (1st) 161573, ¶ 32 (providing that in a bench trial, it is for the judge, sitting as the trier of fact, to determine the credibility of the witnesses, to weigh the evidence and draw reasonable inferences therefrom, and to resolve conflicts in the evidence). The court noted that Harlan, an assistant director of security for a hospital, claimed he observed the shooter enter a specific house after the shooting, yet did nothing about it. The court also noted that Harlan claimed Paraharm was near the benches at the same time as Nephew before the shooting, but Paraharm never mentioned Nephew being there. The record establishes that Paraharm denied knowing anyone named Nephew or Mobley. The trial court further found that the testimony regarding Mobley's vehicular hijacking was "beyond irrelevant" and "had nothing to do with this case at all." We note that when the court provisionally granted defendant's motion *in limine* to present this evidence, it questioned the relevancy and stated that the testimony only established Mobley had a handgun on the date of the vehicular hijacking.

¶ 107 Moreover, the record establishes that the trial court found the alibi testimony from Paraharm, Freeman, Huskey, and Smith not credible. The court explained its reasoning, discussing their testimony in detail. This court will not reweigh the evidence or substitute our judgment for the trier of fact, especially when credibility determinations are at the heart of the case. *Jackson*,

232 Ill. 2d at 280-81. The trial court was not obligated to accept the testimony from defendant's witnesses simply because it was unimpeached. The trier of fact is free to accept or reject as much or as little of a witness' testimony as it pleases. *People v. Logan*, 352 Ill. App. 3d 73, 81 (2004). Defendant argues that the trial court's findings do not support its credibility determinations. Our review of the record does not substantiate that assertion. The trial court's findings are supported by the record, and we find no basis to disturb its credibility determinations.

¶ 108                                  CONCLUSION

¶ 109   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 110   Affirmed.