2021 IL App (1st) 182528-U

No. 1-18-2528

FIFTH DIVISION
AUGUST 6, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 460 |
| | ) | |
| GREGORY TERRY, | ) | Honorable |
| | ) | Allen F. Murphy, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The judgment of the circuit court is affirmed in part where the admission of the complainant's prior consistent statements was not reversible error and did not prejudice the defendant, and where the trial court properly exercised its discretion in imposing two sentences that would run consecutively to one another and to five other sentences that were statutorily mandated to run consecutively. We vacate the defendant's sentence for indecent solicitation of a child, where the defendant received a Class 1 sentence on the Class 2 offense, and remand for resentencing on that count.

¶ 2     Following a bench trial in the circuit court of Cook County, the defendant Gregory Terry was found guilty of five counts of criminal sexual assault, one count of indecent solicitation of a child, three counts of aggravated criminal sexual abuse, two counts of sexual relations within families, and two counts of criminal sexual abuse. The defendant was sentenced to four years in prison on each of the five criminal sexual assault counts, four years on the indecent solicitation of a child count, and three years on each of the three aggravated criminal sexual abuse counts, the majority of the sentences to be served consecutively.

¶ 3     On appeal, the defendant argues that the State elicited inadmissible testimony regarding prior consistent statements made by the complainant. He also asserts that the trial court improperly imposed two sentences to run consecutively to his five mandatorily consecutive sentences for criminal sexual assault. Additionally, the parties agree that the defendant improperly received a Class 1 sentence for the offense of indecent solicitation of a child, a Class 2 offense. We affirm in part, reverse in part, and remand for resentencing.

¶ 4                                    BACKGROUND

¶ 5     The defendant was charged by indictment with 26 counts involving his sexual conduct with and sexual penetration of D.A. The State proceeded to trial on five counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1), (3), (4) (West 2010, 2012, 2014)); one count of indecent solicitation of a child (720 ILCS 5/11-6(a) (West 2014)); three counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2012, 2014)); two counts of sexual relations within families (720 ILCS 5/11-11 (West 2012, 2014)); and two counts of criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2014)). The counts alleged *inter alia* that the defendant committed multiple instances of contact between his mouth and D.A.'s penis and sex organ, his anus and D.A.'s penis,

and his hand and D.A.'s penis and sex organ, and that D.A. was the defendant's nephew and under the age of 18 at the time of the offenses, which spanned multiple time periods from April 28, 2012, through November 25, 2015. The State nol-prossed the remaining charges.

¶ 6　　At trial, D.A. testified that the defendant was his uncle on his father's side of the family and was HIV/AIDS positive. D.A. was taken from the care of his mother in California at the age of seven or eight. At the age of eight or nine, he moved to North Carolina to live with the defendant's sister, Stephanie Jean Terry Johnson. When he was about 10 to 12 years old, the defendant and the defendant's then-boyfriend Daniel Martin picked up D.A. and took D.A. to live with them in a two-bedroom apartment in Lansing, Illinois. Initially, the defendant and Martin shared a bedroom, while D.A. had his own room.

¶ 7　　D.A. described being happy with the defendant and Martin at first. However, D.A.'s relationship with the defendant became "weird" when D.A. was about 14 or 15 years old, after D.A.'s mother died and D.A. overheard the defendant state "that b*** deserved to die." The defendant told D.A. that the defendant had learned that D.A. was not circumcised, that D.A. did not "wash behind the skin," and that the defendant needed to make sure D.A. did so. When D.A. would exit the shower, the defendant would ask D.A. if he "pull[ed] back" and washed his genitals.

¶ 8　　After about three weeks of this, the defendant pulled back the shower curtain while D.A. was showering, told D.A. to wash his "genital area," and watched D.A. as he complied. The defendant would also "randomly" call D.A. into the defendant's bedroom after D.A. showered to make sure D.A.'s genital area "didn't stink." D.A. would expose his penis to the defendant, and the defendant would "lean in" and smell it.

¶ 9 When D.A. was about 15 years old, the defendant asked D.A. if D.A. knew how to put on a condom, and D.A. said, "Yeah." Later that day, the defendant entered D.A.'s bedroom with a condom and said, "[S]how me how to put it on." Once D.A. was correctly wearing the condom, the defendant told D.A. "to ejaculate into the condom." D.A. masturbated at the side of his bed while the defendant stood in the bedroom doorway and watched. After about five minutes, the defendant walked to the side of D.A.'s bed, kneeled down in front of D.A.'s legs, and touched D.A.'s testicles with his hands, mouth, and tongue. D.A. stopped masturbating and asked the defendant what he was doing, but the defendant told D.A. to "keep going."

¶ 10 D.A. did not tell anyone what happened because he did not think anyone would listen to him, as the defendant told him that the defendant was "the only one there" for him, nobody trusted D.A., and D.A.'s family thought D.A. was a liar and thief.

¶ 11 About one month later, the defendant began to discipline D.A. by asking D.A. whether he wanted a "whooping," which meant a "beating" with a belt, or a "punishment." Eventually, D.A. selected the "punishment" to learn what it was. The defendant then told D.A. to remove his shorts and boxers and gave D.A. oral sex. The defendant did this consistently for three years, sometimes twice a week and sometimes every other week, and the defendant performed oral sex on D.A. "at least" over 100 times.

¶ 12 On one occasion, when D.A. was still 15 years old, the defendant bought a box of enemas and called D.A. into the bathroom. The defendant explained that the enema was for "clean[ing] out your rectum," and told D.A. "this is one of the things you have to do if you're going to have sex with a guy." D.A. told the defendant, "I don't plan on having sex with a guy." Nonetheless, the defendant used an enema on himself in D.A.'s presence, and made D.A. use an enema as well,

despite D.A.'s protests. While the enema bottle was inserted inside D.A.'s rectum, the defendant grabbed the bottle and squeezed it "hard." D.A. testified that it "felt weird and *** hurt."

¶ 13    On another occasion, when D.A. was 16 years old, D.A. got in trouble at school and came home. The defendant told D.A. he was "going to make [D.A.] his b***" and called D.A. into the defendant's room. The defendant was sitting on his bed and told D.A. that he "was going to have [D.A.] f*** him." The defendant directed D.A. to take a condom from a shelf. D.A. complied, "got ready," and inserted his penis inside the defendant's anus. D.A. felt like he "wanted to die" as this happened. After D.A. "finished," D.A. went into his room.

¶ 14    When D.A. was 16 or 17 years old, Martin began sleeping in the living room, and the defendant would occasionally join D.A. in his bedroom at "[a]ny time" of day or night. The defendant's conduct continued until December 3, 2015, when D.A. was 18 years old. About two weeks before December 2015, Martin moved into a different apartment unit in the same complex. Prior to Martin moving out, D.A. knew that the defendant was going to move with D.A. to North Carolina. When Martin moved out, D.A. felt "done for." D.A. knew he was "totally alone," with no one to talk to. He thought of suicide, and that the only way to escape was if he killed the defendant.

¶ 15    D.A. visited Martin and learned that the defendant's new place in North Carolina was going to be about two hours away from D.A.'s family. D.A. told Martin he was going to "shut and lock the door" to his room. Martin asked why, and asked if the defendant was "touching" him. D.A. did not initially tell Martin anything, but Martin kept asking. Knowing "it was something that [D.A.] had to bring about" because otherwise he was either going to kill himself or the defendant, D.A. then told Martin that the defendant "actually was touching me."

¶ 16    Martin made some phone calls and told D.A. to wait at home until D.A.'s cousin, Bessie Jackson, called for him. Jackson did call and D.A. went to her apartment, which was in the same apartment complex. Jackson asked D.A. "the same thing that [Martin] had asked [him]," and D.A. "told her yes." D.A.'s cousin Vickie Terry[1] then arrived and took D.A. to her house. Vickie "asked the same questions," and D.A. "answered them." D.A. then went to the police station and never saw the defendant again.

¶ 17    On cross-examination, D.A. confirmed that he saw Martin and Jackson every day but did not tell them or any other family members about the defendant's sexual conduct. D.A. confirmed that he was initially "ready to go" to North Carolina. Defense counsel asked D.A., "All the way up to December 3rd you were going to North Carolina, right?" D.A. answered, "Up until that day."

¶ 18    D.A. confirmed that he went to Martin's apartment and "told [Martin] about the allegations [he] made here today." Defense counsel asked, "And you did that on the day you were supposed to leave to North Carolina?" D.A. responded that he did not know he was supposed to leave that day, and thought he was not leaving for two more days. D.A. then confirmed that he later told Jackson what he told Martin and subsequently told Vickie "the same thing." When D.A. went to the police station, the defendant was already there, but D.A. denied that the defendant had filed a missing person report for D.A. Counsel asked D.A., "At some point you decided you did not want to go to North Carolina; is that correct?" D.A. responded, "I already had that made up in my mind."

¶ 19    Martin testified that he met the defendant around 2000. When D.A. first lived with the defendant and Martin around 2012, they had a "really good relationship." Over time, however, the

---

[1] Because witnesses Vickie Terry and Paige Renee Terry have the same last name as the defendant, we will refer to Vickie and Paige by their first names. Vickie Terry's first name is also occasionally spelled as "Vicky" in the record on appeal. Since she spelled her name as "Vickie" at trial, we use that spelling.

defendant enforced stricter rules for D.A. and would not allow D.A. to leave the house, only allowed D.A. to have friends over "at a certain time," and "had to know when or where [D.A.] was at *** any time."

¶ 20   During one Thanksgiving celebration with the defendant's family, the defendant "blurted out" that his nephew "had a big old d***" in front of two family members. When D.A. was 15 years old, Martin also overheard the defendant ask D.A. whether he wanted a "punishment" or a "whooping," but Martin did not know what the defendant meant. Martin further learned that the defendant had shown D.A. how to use an enema and confronted the defendant about it. The defendant responded that he was "just showing" D.A. after having some conversations with D.A.

¶ 21   Martin eventually broke up with the defendant because Martin did not "like the way the living situation was going." He felt that the defendant "was just more into" D.A., and "everything was about" D.A. During the time Martin was sleeping in the living room, Martin occasionally saw the defendant lying on D.A.'s bed, sometimes at 3 or 4 a.m. The defendant told Martin he was "comforting" D.A. because D.A.'s mother had died. The defendant would "always" tell Martin that D.A. was a liar and could not be trusted.

¶ 22   In December 2015, D.A. visited Martin's new apartment. D.A. told Martin he had seen the North Carolina apartment he was moving to, and stated, "[T]hank God my bedroom has a lock on the door." Martin asked D.A. what he meant, and D.A. stated that "he just didn't want anybody to be able to come into his room at any time while he was asleep." Martin asked D.A. what he was talking about. D.A. "broke down crying" and told Martin that the defendant had been "giving him oral sex" whenever Martin left the apartment and that the defendant made D.A. "have sexual contact in his rectum." Martin asked D.A. why he "let this happen," and why D.A. did not tell

Martin about it, and told D.A., "You know that I was there for you and that we could have stopped this." D.A. replied that "when someone gives you things and does a lot for you, you have to pay them back."

¶ 23    Vickie testified that the defendant was her first cousin and D.A. was her second cousin. She noticed that the defendant was overprotective and controlling of D.A., would not let D.A. "go out," would not let Vickie have access to D.A., and would not let D.A. spend time with other family members without the defendant being there. One day, the defendant drove Vickie to work and rubbed D.A.'s knee in front of her. Vickie asked the defendant to stop, and the defendant stated that "his skin is so soft." When they exited the vehicle, the defendant "play[ed]" with D.A.'s hair and beard and stated that D.A. is "so soft," and "[i]t feels good."

¶ 24    During a Thanksgiving celebration, the defendant referred to D.A., held his hand out in front of his genital area, and stated D.A. was "hanging long." That same night, the defendant told Vickie that D.A. did not clean himself well, and that the defendant made D.A. stand in front of him to make sure that he was clean. The defendant told Vickie that the defendant "skinned [D.A.] back" and "smelled him."

¶ 25    On December 3, 2015, Vickie received a call from Jackson. She met with Martin, Jackson, and D.A. outside Martin's apartment, and D.A. "fell" into Vickie's arms crying. Vickie entered her vehicle with D.A., and D.A. told her that the defendant "was giving him head since he was 14." Vickie took D.A. to her house and told him, "[I]f anything you said is not true because you want to get away from him, then you need to let me know right now." D.A. said "no" and "[c]ousin, call the police, please." Vickie called the police.

¶ 26    On cross-examination, Vickie confirmed that she never heard about any abuse until she received the phone call from Jackson.

¶ 27    Jackson testified that she, the defendant, and D.A. were cousins, and lived in the same apartment complex in 2014 and 2015. The defendant was controlling with D.A., and D.A. was not often allowed to spend time with friends. Jackson had seen the defendant rub D.A.'s leg before, and she previously told the grand jury that she saw the defendant rub D.A.'s face. Jackson did not perceive the defendant's behavior towards D.A. to be sexual but thought it was "over the top" and "overprotective." The defendant told Jackson he used D.A.'s own body to show D.A. how to put on a condom. According to Jackson's prior grand jury testimony, the defendant also told Jackson that the defendant had shown D.A. how to use an enema and " 'made [D.A.] do it.' "

¶ 28    On December 2, 2015, Jackson received a phone call from Martin, who told her D.A. had said the defendant "was inappropriately touching him." Jackson called the defendant and asked the defendant to send D.A. to her apartment. Jackson told the grand jury that after she spoke with D.A., she believed D.A. was telling the truth. Jackson also told the grand jury that the defendant " 'painted [D.A.] to be a liar,' " and she realized the defendant " 'wanted us to think [D.A.] was a liar so that we wouldn't believe nothing [D.A.] said.' "

¶ 29    The defendant moved for directed verdict, arguing that D.A. was "not credible" because he had a "motive to fabricate this lie" and "fabricated on the day that they were supposed to relocate to North Carolina." The court denied the defendant's motion.

¶ 30    The defense called the defendant's sister, Ms. Johnson, who testified that D.A. stayed with her in North Carolina for three and one-half to four years before D.A. lived with the defendant. When the defendant offered to care for D.A., Johnson told the defendant that D.A. had "a lot of

problems," including that D.A. was uncircumcised, "was getting ring worms and problems with his area," and a doctor had told her "to make sure that [D.A.] pulls back that skin and cleans it *** or it will get [an] infection." Johnson also told the defendant that D.A. "is manipulative and tells lies," and he does not like to take showers and "just runs the water."

¶ 31    Paige Renee Terry, the defendant's younger sister, testified that she had a "good aunt-nephew relationship" with D.A. Paige spoke with D.A. frequently, and D.A. never mentioned "anything going on in the home, whether [the defendant] was mean to him or anything like that."

¶ 32    The defendant testified that he was HIV positive, had kidney failure, which caused him to be chronically tired, and was on dialysis. The defendant denied that he performed oral or anal sex with D.A. or "touched [D.A.] in a sexual manner at all." Eventually, Martin broke up with the defendant and moved out of the apartment, and the defendant made plans to move to North Carolina on December 3, 2015. On December 3, at about 9 p.m., Jackson called the defendant and asked him to send D.A. upstairs to help her move something. The defendant testified, "Unbeknownst to me, [D.A.] had already been out, and he made these outrageous claims to Daniel Martin." After D.A. went upstairs, the defendant looked "all around the apartment building" for D.A. but could not find him and called the police.

¶ 33    The defendant stated D.A. had been "aggressive" towards the defendant and, as punishment, the defendant would tell D.A. he "can't go anywhere" or would take D.A.'s phone, video games, or television. The defendant stated he punished D.A. because D.A. "took it upon himself to think that he was a grown person," and would return home late or "come in high off of, I don't know what." D.A. also lied "about going to school" and "his little girl friend that he got."

¶ 34 On cross-examination, the defendant testified that he and D.A. agreed it would be better if D.A.'s mother's side of the family did not contact him on Facebook. However, the defendant denied that he prohibited D.A. from attempting to contact other family members. The defendant also denied that he prohibited D.A. from going places with Jackson or Vickie. However, he confirmed that he would tell D.A. he "could have a punishment or a whooping."

¶ 35 The defendant denied that he ever smelled or inspected D.A.'s penis or showed D.A. how to put on a condom. He also denied telling Vickie that he " 'would skin [D.A.] back and smell him to make sure he's clean.' " He acknowledged that he once brought D.A. with him to take Vickie to work and placed his hand on D.A.'s knee but denied "rubbing" his knee or touching his hair. The defendant denied teaching D.A. how to use an enema, but stated he bought D.A. an enema because D.A. asked him to do so. He denied stating that D.A. "had a big ol' d***" at a Thanksgiving celebration but testified he "guess[ed]" his family was upset with him after that day, and his family is "upset about anything." The defendant testified that he only said, " '[W]ow, he's huge to be 14.' "

¶ 36 The defendant confirmed that when he sent D.A. upstairs to help Jackson, he did not know D.A. had made allegations against him. The defendant then also confirmed that, when he called the police to his apartment that day, he told an officer that he believed D.A. had gone to the police department the previous day alleging that the defendant had touched D.A. inappropriately.

¶ 37 On redirect examination, the defendant confirmed that D.A. eventually got "too big to whoop," and so the defendant would punish D.A. by taking away his video games and "things like that."

¶ 38    In closing, the State asserted that "this is not an incident where you have one person's word against the defendant," but rather, D.A.'s testimony was "supported and corroborated" by people who had known the defendant "much longer than even [D.A.] has." The defense argued that D.A. had not told anyone about the defendant's sexual behavior towards him until D.A. "turn[ed] 18, when he already made a commitment to move to North Carolina and then he goes and tells his story." The defense argued that D.A. had a "motive to lie" and "hated" the defendant, although the defendant was "trying to protect him" and raise him properly.

¶ 39    The court found the defendant guilty on all counts. The court stated that D.A. suffered an "unspeakable ordeal living with the defendant." It fully understood why "there was no outcry when these actions went on," stating D.A. "was trapped on an island with no resources," "had absolutely nowhere to turn to," and thought no one would believe him. The court described the defendant's "act of smelling [D.A.'s] genitals" as "absolutely outrageous." The defendant wanted to see how far he could go with D.A., whether D.A. would put on the condom, then whether he would perform the enema, and finally "the sexual assault occurred."

¶ 40    The court stated "this" was not supported by medical evidence, but was "corroborated by family members, *** by Daniel Martin, *** by [Vickie]; completely inappropriate behavior at family gatherings; speaking of [D.A.] had a big ol' d***, that's at a family function." The court remarked, "[T]o say such a thing is just—you can't get your head around it." The court recounted that Vickie testified the defendant "said words to the effect that he was hanging low down there," "referring to the size of [D.A.'s] penis." The court also observed that Vickie saw the defendant "stroking [D.A.'s] skin and hair." The defendant told her D.A.'s skin was "so soft," and was told

his actions were completely inappropriate. The court concluded that Martin and Vickie's accounts corroborated D.A.'s account, and that D.A. "was a compelling, credible, consistent witness."

¶ 41 The court denied the defendant's motion for new trial, which alleged that the State failed to prove him guilty beyond a reasonable doubt.

¶ 42 At sentencing, the State argued in aggravation that D.A.'s suffering "at the hands of this the defendant is truly remarkable," and D.A. "was truly like a bird trapped in a cage" with "no way out." The State remarked that the defendant was "grooming" D.A. so he could "submit acts against him," and that D.A. endured this behavior for nearly three years. The State detailed the counts for which the defendant was found guilty, and asserted that the applicable sentencing range was 27 to 97 years' imprisonment. The State argued that while it did not believe the defendant should receive a minimum sentence, it would not object to a 27-year prison term.

¶ 43 The defense argued that the defendant was 42 years old, was raised in a "loving family," had a GED and some college education, and had no criminal background. The defense emphasized that the defendant had kidney failure and other ailments that shortened his lifespan, and stated that "[t]his will probably never happen again due to his age and his health." The defense therefore requested the minimum sentence.

¶ 44 The defendant stated in allocution that he was "truly sorry" and "truly devastated this had even happened." He stated that he "didn't do this," and asked for the minimum sentence.

¶ 45 The trial court stated that it had considered the evidence at trial and factors in aggravation and mitigation, and that the minimum sentence "is quite a severe sentence, considering the defendant's medical condition." It sentenced the defendant as follows: consecutive prison terms of four years on each of the five criminal sexual assault counts (counts II, IV, V, VII, and IX); a

four-year Class 1 sentence on indecent solicitation of a child count X, to run consecutively to the criminal sexual assault counts; a three-year sentence on aggravated criminal sexual abuse count XII, to run consecutively to the "other counts"; a three-year sentence on aggravated criminal sexual abuse count XIV, to run consecutively to count XII but concurrently with the "other" counts "Two through Ten"; and a three-year sentence on aggravated criminal sexual abuse count XXII, to run consecutively to counts XII and XIV.[2] The court merged the two counts for sexual relations within families and the two counts for criminal sexual abuse into aggravated criminal sexual abuse count XXII "and above." The record does not reflect that a motion to reconsider sentence was filed.

¶ 46                                    ANALYSIS

¶ 47    The defendant filed a timely notice of appeal; therefore, this court has jurisdiction. On appeal, the defendant first argues that the State presented inadmissible testimony that D.A. had made prior consistent statements to Martin, Vickie, and Jackson that the defendant was inappropriately touching him and performing sexual acts on him. The defendant cites the following testimony: D.A.'s testimony that he told Martin that the defendant was touching him and told Jackson and Vickie what happened; Martin's testimony that D.A. told him the defendant had been performing sexual acts on him, which included the defendant "giving him oral sex" and making D.A. "have sexual contact in his rectum"; Vickie's testimony that D.A. told her the defendant had been giving him oral sex; and Jackson's testimony that Martin told her D.A. told him the defendant was inappropriately touching him.

---

[2] At sentencing, the trial court ordered that the defendant's three-year sentence for count XXII was to run consecutively to counts XII and XIV. However, the mittimus states that the sentence on count XXII was to run "concurrent", and makes no mention that it would run consecutively to counts XII and XIV. The court's oral pronouncement controls. See *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 62. Regardless, the defendant does not challenge the count XXII sentence on appeal.

¶ 48    The defendant acknowledges that he failed to preserve this issue for appeal, as he neither objected to the testimony regarding D.A.'s prior consistent statements at trial nor raised the issue in his posttrial motion. See *People v. Reese*, 2017 IL 120011, ¶ 60 ("To preserve an issue for review, a defendant must object at trial and raise the alleged error in a written posttrial motion."). But he asserts that we may consider this forfeited issue under the plain error doctrine because the evidence was closely balanced. Alternatively, the defendant asserts that his trial counsel was ineffective for not objecting to this evidence at trial.

¶ 49    The State responds that no plain error occurred because there was no error at all, as D.A.'s prior statements to the three witnesses were admissible to rebut the defendant's theory that D.A. had a motive to testify falsely and fabricated his allegations against the defendant to avoid moving to North Carolina. The State also asserts that, even if there was error, plain error review is unwarranted as the evidence was not closely balanced. It also contends trial counsel was not ineffective.

¶ 50    We first consider the defendant's assertion that we may reach his challenge to the admissibility of the prior consistent statements under the plain-error doctrine.

¶ 51    Under the plain-error doctrine, a reviewing court may address a forfeited claim where a "clear or obvious error occurred," and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.* ¶ 69. The defendant carries the burden of persuasion under both prongs of the rule. *People v. Lewis*, 234 Ill. 2d 32, 43 (2009).

¶ 52    The defendant argues the first prong of the plain error doctrine applies here as the consistent statements were inadmissible, and the errors were plain and not harmless because the evidence at trial was closely balanced.[3] The initial step in a plain error analysis is to determine whether a plain and obvious error occurred at trial. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 53    "Generally, statements made prior to trial for the purpose of corroborating trial testimony are inadmissible." *People v. Cuadrado*, 214 Ill. 2d 79, 90 (2005). However, we need not address whether the challenged statements were improperly admitted here as we find the evidence was not closely balanced and there was, therefore, no first prong plain error as the defendant claims.

¶ 54    Under the first prong of the plain error doctrine, the defendant must show "that the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him, *i.e.*, that the verdict may have resulted from the error and not the evidence properly adduced at trial," or "that there was a reasonable probability of a different result had the evidence in question been excluded." (Internal quotation marks omitted.) *People v. White*, 2011 IL 109689, ¶ 133. In other words, the defendant must show the error was prejudicial due to "the fact that it occurred in a close case where its impact on the result was potentially dispositive." *Sebby*, 2017 IL 119445, ¶ 68. The defendant does not make that showing here.

¶ 55    As an initial matter, the defendant received a bench trial, and so "we presume the trial court considered only competent evidence in reaching its verdict, unless that presumption is rebutted by affirmative evidence in the record." (Internal quotation marks omitted.) *People v. Moon*, 2019 IL App (1st) 161573, ¶ 28; see also *People v. Ware*, 323 Ill. App. 3d 47, 53 (2001) (finding the

---

[3] In *People v. Keene*, 169 Ill. 2d 1, 18 (1995), our supreme court found consistent statements do not implicate a substantial right, thus foreclosing a claim under second prong plain error.

defendant was not prejudiced by the admission of prior consistent statements, where the defendant received a bench trial, and so "the concerns associated with [a] jury's reliance on prior consistent statements" were "not present").

¶ 56    The record does not rebut this presumption. Notwithstanding the defendant's assertion to the contrary, the circuit court did not state that it considered the testimony regarding D.A.'s prior consistent statements when it explained its findings of guilt. The court did state D.A.'s allegations against the defendant were "corroborated by family members [Martin and Vickie]." However, it then immediately described the evidence that the defendant's family members saw the defendant touch D.A. inappropriately and heard the defendant refer to D.A.'s penis size. Viewed in context, the court's statement regarding corroboration referred to the numerous instances in which D.A.'s family members saw the defendant acting inappropriately towards D.A. and not to testimony regarding D.A.'s consistent statements to Martin, Vickie, and/or Jackson. Accordingly, the record does not rebut our presumption that the trial court only considered admissible evidence in finding the defendant guilty. *Moon*, 2019 IL App (1st) 161573, ¶ 28.

¶ 57    Moreover, the evidence against the defendant at trial was not closely balanced. To prove the defendant guilty of four of the criminal sexual assault counts as charged, spanning four different time periods, the State had to prove D.A. was at least 13 but under 18 years old, the defendant was D.A.'s uncle, and the defendant knowingly committed an act of sexual penetration upon D.A. by making contact between the defendant's mouth and D.A.'s penis (counts II and IV), the defendant's anus and D.A.'s penis (count VII), and the defendant's mouth and D.A.'s sex organ (count IX). 720 ILCS 5/11-1.20(a)(3), (4) (West 2010, 2012, 2014). To prove the fifth criminal sexual assault count, the State had to prove that, during yet another time period, the defendant

knowingly committed an act of sexual penetration upon D.A. by making contact between the defendant's mouth and D.A.'s penis by the use of force or threat of force (count V). 720 ILCS 5/11-1.20(a)(1) (West 2014).

¶ 58    To establish indecent solicitation of a child as charged, the State had to show that the defendant, with the intent to commit criminal sexual assault of a child, knowingly solicited D.A., a child or whom he believed to be a child, to perform an act of sexual penetration, contact between the defendant's anus and D.A.'s penis (count X). 720 ILCS 5/11-6(a) (West 2012, 2014). To prove the defendant guilty of aggravated criminal sexual abuse as charged, the State had to show that, during three different time periods, D.A. was under 18 years old, the defendant was his uncle, and the defendant knowingly committed an act of sexual conduct upon D.A. for the purpose of the sexual gratification or arousal of the defendant or D.A. by making contact between the defendant's hand and D.A.'s penis (counts XII and XIV) and the defendant's hand and D.A.'s sex organ (count XXII). 720 ILCS 5/11-1.60(b) (West 2012, 2014). It is uncontested that D.A. was at least 13 years old but under 18 years of age at the time of the offenses, and that the defendant was his uncle and knew D.A. was a child.

¶ 59    D.A. testified in great detail regarding the years of sexual abuse the defendant inflicted on him, reciting a litany of sexual acts the defendant committed against him, including repeated anal sex, hand to penis sex, and over a hundred instances of oral sex. D.A. testified the defendant *inter alia* forced him to expose his penis to the defendant so the defendant could smell it, forced him to use an enema while the defendant watched, forced him to ejaculate into a condom while the defendant watched and participated, and characterized him as a thief and a liar to family members. The trial court found D.A. to be "a compelling, credible, consistent witness," and we defer to that

determination. *People v. Anaya*, 2017 IL App (1st) 150074, ¶¶ 96-99 (providing "great deference" to the credibility determinations of the trier of fact in determining the evidence at trial was not closely balanced).

¶ 60    D.A.'s testimony alone was sufficient to convict. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (testimony of a single credible witness is sufficient to convict). But here the testimony of multiple witnesses close to both the defendant and D.A. corroborated numerous aspects of D.A.'s testimony. For example, Vickie testified the defendant told her he made D.A. stand in front of him, "skinned [D.A.] back" and "smelled him." Jackson testified the defendant told her he used D.A.'s own body to show D.A. how to put on a condom and made D.A. use an enema. Martin testified that, when he found out the defendant had shown D.A. how to use an enema, he confronted the defendant and the defendant acknowledged having done so.

¶ 61    In addition, witnesses heard and saw D.A. engage in sexually suggestive conduct toward D.A. Martin and Vickie both testified they heard the defendant refer to the size of D.A.'s penis. Vickie and Jackson both recalled seeing the defendant rub D.A. Vickie witnessed the defendant rub D.A.'s knee and "play***" with D.A.'s beard. When she called the defendant out on the behavior, he described D.A. as "so soft" and said D.A. felt "good." In addition, Martin, Vickie, and Jackson consistently described the defendant as controlling of D.A., and their testimony showed that the defendant painted D.A. as a "liar" to his family. Martin testified he sometimes saw the defendant lying on D.A.'s bed around 3 or 4 in the morning. Martin broke up with the defendant because the defendant was "more into" D.A. and "everything was about" D.A. In sum, even without the prior consistent statements, the testimony of State's witnesses corroborated and bolstered D.A.'s testimony.

¶ 62 The fact that the defendant presented an alternate version of events at trial does not make the evidence in this case closely balanced. The defendant denied he performed oral or anal sex on D.A., touched him in a sexual manner, smelled or inspected D.A.'s penis, or showed him how to put on a condom or use an enema. However, Vickie, Jackson, and Martin's testimony not only corroborated D.A.'s testimony but rebutted many of the defendant's denials, testifying variously that the defendant told them he smelled D.A.'s penis and he used the defendant's own body to demonstrate use of an enema and condom. Given the credibility and corroboration of D.A.'s testimony that the defendant solicited and forced repeated acts of oral, anal, and hand sex upon him for years and the rebuttal of the defendant's self-serving testimony, we cannot conclude that the evidence at trial was closely balanced. See *People v. Young*, 2013 IL App (2d) 120167, ¶ 31 (finding the evidence at trial was not closely balanced where the defendant's evidence was "merely *** self-serving testimony"). Accordingly, no plain error occurred, and we must honor the defendant's procedural default of this issue. *Johnson*, 208 Ill. 2d at 64.

¶ 63 We similarly reject the defendant's ineffective assistance of counsel claim premised on trial counsel's failure to object to the prior consistent statements at trial and raise the issue in a posttrial motion. To prevail on an ineffective assistance claim, a the defendant must establish that (1) "counsel's performance was objectively unreasonable under prevailing professional norms," and (2) "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). The prejudice element of an ineffective-assistance claim is similar to the first prong of the plain-error doctrine. See *People v. Johnson*, 218 Ill. 2d 125, 143 (2005). As we have found, the evidence of the defendant's guilt was overwhelming,

and the defendant cannot show that the outcome of his trial would have been different had D.A.'s prior consistent statements not been admitted. Accordingly, there was no prejudice for purposes of the first prong of plain error, and there cannot be prejudice for purposes of an ineffective assistance of counsel claim. *Id* at 144. The defendant's ineffective assistance of counsel claim fails.

¶ 64 The defendant next argues he is entitled to a new sentencing hearing because he was improperly sentenced to a Class 1 sentence for indecent solicitation of a child (count X). The State agrees. While the defendant did not preserve this issue for appeal, " '[t]he imposition of an unauthorized sentence affects substantial rights' under the second prong of plain error." *People v. Lashley*, 2016 IL App (1st) 133401, ¶ 68 (quoting *People v. Hicks*, 181 Ill. 2d 541, 545 (1998)).

¶ 65 Sections 11-6(c)(1) and 11-6(c)(2) of the Code (720 ILCS 5/11-6(c)(1), (2) (West 2014)) provide that indecent solicitation of a child is "a Class 1 felony when the act, if done, would be predatory criminal sexual assault of a child or aggravated criminal sexual assault" or "a Class 2 felony when the act, if done, would be criminal sexual assault." Here, count X charged the defendant committed indecent solicitation of a child when he, "with the intent that the offense [of] criminal sexual assault of a child be committed," solicited D.A. to perform an act of sexual penetration, namely, contact between his anus and D.A.'s penis.

¶ 66 We agree with the parties that the underlying conduct for this charge would only form a basis for the offense of criminal sexual assault, as none of the circumstances supporting a finding of either aggravated criminal sexual assault (see 720 ILCS 5/11-1.30 (West 2014)) or predatory criminal sexual assault (see 720 ILCS 5/11-1.40 (West 2012, 2014)) exist. Accordingly, the defendant was subject to a Class 2 sentencing range of 3 to 7 years (730 ILCS 5/5-4.5-35(a) (West 2014)), not a Class 1 sentencing range of 4 to 15 years (730 ILCS 5/5-4.5-30(a) (West 2014)). We

vacate the Class 1 sentence on indecent solicitation of a child count X and remand for sentencing on this count. See *People v. Hall*, 2014 IL App (1st) 122868, ¶ 15 (remanding for resentencing where the trial court relied upon the wrong sentencing range in imposing sentence, even though the sentence fell within the permissible sentencing range).

¶ 67   The defendant lastly argues he is entitled to a new sentencing hearing because his sentences for criminal sexual assault should have been made consecutive to only one non-triggering sentence instead of two. Specifically, he claims the trial court erred in ruling that the sentences for indecent solicitation of a child count X and aggravated criminal sexual abuse count XII would run consecutively to the sentences for the five criminal sexual assault counts, which are statutorily mandated consecutive sentences. He argues either count X or count XII should have been consecutive, and the other count should have run concurrently. The State responds that the circuit court properly exercised its discretion in determining that the sentences on both counts X and XII should run consecutively to the five criminal sexual assault sentences.

¶ 68   We previously held that the Class 1 sentence for indecent solicitation of a child count X was improper and vacated that sentence. However, as consecutive sentencing on that count may recur on remand, we will address the defendant's consecutive sentencing argument regarding this count. See *People v. Wigod*, 406 Ill. App. 3d 66, 77 (2010).

¶ 69   The defendant concedes he did not preserve his consecutive sentencing claim for appeal but asserts we may reach the issue through the plain-error doctrine. *People v. Harvey*, 2018 IL 122325, ¶ 15 ("In order to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). In the alternative, he argues his trial counsel was ineffective for failing to raise this issue before the trial court. Before

examining this issue under plain-error review, we first examine whether an error occurred at all. *Reese*, 2017 IL 120011, ¶ 60. For the following reasons, we find no error here, and therefore find neither plain error nor ineffective assistance of counsel.

¶ 70    The Illinois Code of Corrections provides for both permissive and mandatory consecutive sentences. Section 5-8-4(a) of the Code provides that where an Illinois court imposes multiple sentences of imprisonment on a defendant at the same time, the sentences are to run concurrently "unless otherwise determined by the Illinois court under this Section." 730 ILCS 5/5-8-4(a) (West 2012, 2014). Section 5-8-4(d) provides for mandatory consecutive sentences for a litany of offenses including, as relevant here, where a defendant was convicted of criminal sexual assault. 730 ILCS 5/5-8-4(d)(2) (West 2012, 2014). An offense enumerated in section 5-8-4(d) "triggers" consecutive sentences. *People v. Whitney*, 188 Ill. 2d 91, 99 (1999).

¶ 71    It is undisputed that the defendant was properly sentenced to mandatory consecutive terms of imprisonment on his five criminal sexual assault convictions (720 ILCS 5/11-1.20 (a)(1), (3), (4) (West 2010, 2012, 2014) as these are triggering offenses under section 5-8-4(d)(2). The Illinois Supreme Court has consistently found that " 'section 5-8-4(a) must be construed so that any consecutive sentences imposed for triggering offenses be served prior to, and independent of, any sentences imposed for nontriggering offenses.' " *People ex rel. Senko v. Meersman*, 2012 IL 114163, ¶ 19 (quoting *People v. Curry*, 178 Ill. 2d 509, 539 (1997)). Accordingly, the defendant would serve his five criminal sexual assault convictions prior to and independent of any nontriggering offenses. *Id.*

¶ 72    Indecent solicitation of a child and aggravated criminal sexual abuse are such nontriggering offenses, as they are not set forth in section 5-8-4(d) as requiring mandatory consecutive sentences.

See 730 ILCS 5/5-8-4(d) (West 2012, 2014). As nontriggering offenses, sentences on these counts would generally be served after the five criminal sexual assault consecutive sentences. *Meersman*, 2012 IL 114163, ¶ 19.

¶ 73    The defendant claims that the holdings in *Curry* and *Meersman* reflect a principle that where a defendant receives a mandatory consecutive sentence, the offenses triggering the consecutive sentencing mandate can only run consecutively to one nontriggering offense. In other words, either the indecent solicitation of a child sentence *or* the aggravated criminal sexual abuse sentence would be consecutive to the triggering criminal sexual assault sentences, and the trial court erred in imposing consecutive sentences on both those nontriggering offenses. However, both *Curry* and *Meersman* expressly state that "multiple nontriggering offenses *may* be served concurrently to one another," and in no way suggested such a mandate, particularly because section 5-8-4(c)(1) provides a sentencing court discretion in imposing consecutive sentences. (Emphasis added.) *Meersman*, 2012 IL 114163, ¶ 19; *Curry*, 178 Ill. 2d at 539.

¶ 74    Section 5-8-4(c)(1) provides a court may impose consecutive sentences:

> "[i]f, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is the opinion of the court that consecutive sentences are required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 720 ILCS 5/5-8-4(c)(1) (West 2012, 2014).

"Because the trial court is in the best position to consider a defendant's credibility, demeanor, general moral character, mentality, social environment, and habits, the trial court's imposition of

[nonmandatory] consecutive sentences will not be reversed on appeal absent an abuse of discretion." *People v. Buckner*, 2013 IL App (2d) 130083, ¶ 36.

¶ 75     We do not find the trial court abused its discretion in imposing consecutive sentences on both the indecent solicitation of a child and aggravated criminal sexual abuse counts. The record reflects the defendant sexually abused D.A. for years, obsessively controlling him and isolating him from his family. As the trial court found, the evidence showed the defendant groomed the child for ever more egregious sexual acts by seeing how far he would go. The trial court recognized the defendant's poor health, but determined consecutive sentences were warranted for the indecent solicitation of a child and aggravated criminal sexual abuse counts, accurately describing D.A.'s life with the defendant as an "unspeakable ordeal." Given the egregious nature of the defendant's offenses, we find the trial court did not abuse its discretion in imposing these discretionary consecutive sentences. See *Lopez*, 228 Ill. App. 3d at 1075; see also *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55 (the seriousness of the offense is "the most important sentencing factor").

¶ 76     Section 5-8-4(c)(1) expressly provides the trial court has discretion to imposing consecutive sentences where they are "required to protect the public from further criminal conduct, the basis for which the court shall set forth in the record." 730 ILCS 5/5-8-4(c)(1) (West 2012, 2014). Although the court discussed the evidence in great detail, it did not specifically state consecutive sentences on the indecent solicitation of a child and aggravated criminal sexual abuse counts were required to protect the public. However, the defendant did not request that the trial court specifically make such a finding, and we therefore read section 5-8-4(c)'s provision that the court make that finding as permissive and not mandatory. *People v. Hicks*, 101 Ill. 2d 366, 374 (1984); see also *People v. Lopez*, 228 Ill. App. 3d 1061, 1075 (1992) ("a court's statement of the

basis for the required finding is considered directory rather than mandatory," and "it is required that the record contain facts which support such a finding").

¶ 77    The trial court did not abuse its discretion in imposing consecutive sentences on indecent solicitation of a child count X, and aggravated criminal sexual abuse count XII. See *Buckner*, 2013 IL App (2d) 130083, ¶ 36. Since we find no error, we do not consider the defendant's claims of plain error and ineffective assistance of counsel as to this issue. *People v. Land*, 2011 IL App (1st) 101048, ¶ 146 (declining to consider the defendant's claims of plain error or ineffective assistance where there was no error).

¶ 78                                      CONCLUSION

¶ 79    For the foregoing reasons, we vacate the Class 1 sentence on indecent solicitation of a child count X and remand for resentencing for that count as a Class 2 offense. We affirm the trial court's judgment in all other respects.

¶ 80    Affirmed in part; vacated in part; remanded with directions.